# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-2033

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

DANIEL D. GRAP,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 03-CR-50038—**Philip G. Reinhard**, *Judge.*

———————

ARGUED FEBRUARY 23, 2005—DECIDED MARCH 25, 2005

———————

Before CUDAHY, EASTERBROOK, and WILLIAMS, *Circuit Judges.*

CUDAHY, *Circuit Judge.* Defendant Daniel Grap was indicted for one count of stealing firearms, in violation of 18 U.S.C. § 924(1), and for one count of possessing stolen firearms, in violation of 18 U.S.C. § 922(j). Grap pleaded guilty to the possession of stolen firearms count, but conditioned his plea on the right to appeal the denial of his motion to suppress physical evidence in the form of firearms recovered by a police officer in a warrantless search of his parents' premises. In addition, things did not proceed

smoothly for Grap at sentencing, where the district court applied two enhancements to his sentence based upon its findings that he was a "prohibited person" under the applicable statute and that he had possessed a firearm in conjunction with a felony other than the offense to which he had pleaded guilty. On appeal, Grap contends that the district court erred in denying his motion to suppress physical evidence since his mother lacked the requisite mental capacity to consent to a warrantless search. He also asserts that the enhancements to his sentence violate the Constitution under *United States v. Booker*, 543 U.S. ___, 125 S.Ct. 738 (2005), since they were predicated on factual findings made only by the sentencing judge based only on a preponderance of the evidence. We affirm the denial of Grap's motion to suppress, but order a limited remand for the purpose of allowing the sentencing judge to consider whether to reimpose his original sentence.

I.

On the morning of March 17, 2002, Daniel Grap and his friend, Nathan Bruner, drove to 5701 Montague Road in Rockford, Illinois in Grap's pickup truck. There, Bruner broke into a building on the premises, took six firearms from a bedroom, and carried them out to Grap's vehicle. The two then departed, later divvying up the stolen firearms. Detective James Gallagher of the Winnebago County Sheriff Department was assigned to investigate the stolen firearms and received a tip from Grap's ex-girlfriend, Courtney Hamilton, who claimed to have helped Grap relocate guns from his home and vehicle to a detached garage at his parents' residence in Rockford. Based on this tip, Detective Gallagher visited the Graps' residence at approximately 10:00 a.m. on May 22, 2002, and knocked on the front door, which was opened by the defendant's mother, Mrs. Lila Grap. Detective Gallagher informed Mrs. Grap that his visit

concerned stolen property that he believed to be in her garage and asked for her permission to search that building. Mrs. Grap then asked Detective Gallagher if he was looking for guns, and explained that she had recently spoken with Courtney Hamilton about some firearms. Detective Gallagher had not yet disclosed to Mrs. Grap the nature of the stolen property for which he was searching. Detective Gallagher then produced a written consent form, read it aloud to Mrs. Grap, and handed it to her, but did not inform Mrs. Grap that she could refuse to consent to the warrantless search. After Mrs. Grap reviewed and signed the form, Detective Gallagher also signed it. Mrs. Grap asked no further questions about the form and appeared to understand it.

After both parties had signed the consent form, Mrs. Grap opened the detached garage door with a garage door opener, and Detective Gallagher entered and found three rifles in plain view where Hamilton said they would be. He then carried these rifles out to his police vehicle and placed them on the hood of his car. At this point, Mrs. Grap came back outside and asked Detective Gallagher what he was going to do with the guns. When Detective Gallagher informed her that he believed the guns were stolen, and that he would be taking them with him, Mrs. Grap stated that the guns might belong to her husband. Detective Gallagher asked Mrs. Grap if her husband kept his guns in the garage; she replied that he usually kept them in a closet in the house, prompting Detective Gallagher to request that she check to make sure her husband's guns were still there. Mrs. Grap reentered her house and emerged a moment later to inform Detective Gallagher that her husband's guns were still in the closet. Detective Gallagher then told Mrs. Grap that he would take the guns found in the garage and provided her with a handwritten receipt listing the descriptions of the guns and their serial numbers. Mrs. Grap did not ask any questions about the receipt, and both she

and Detective Gallagher signed it. According to Detective Gallagher, Mrs. Grap appeared to understand everything he had said that day and did not seem confused; thus, at no time did he believe that she lacked the capacity to consent to the warrantless search of her garage.

In July of 2003, Grap was indicted on one count of stealing firearms, in violation of 18 U.S.C. § 924(1), and one count of possession of stolen firearms, in violation of 18 U.S.C. § 922(j). In November, Grap filed a motion to suppress physical evidence. The district court conducted an evidentiary hearing on this motion in December of 2003. At the hearing, Grap argued that Detective Gallagher did not obtain Mrs. Grap's voluntary consent to search the garage, and presented the testimony of her husband and psychiatrist to prove that she was mentally ill and therefore lacked the requisite mental capacity for voluntary consent. Richard Grap testified that his wife had suffered from mental illness for at least ten years, and had refused to take her medication in the time period between January 2002 and May 2002. Dr. Jack Rodriguez, Mrs. Grap's psychiatrist, testified that she had been hospitalized for a delusional disorder that impaired her ability to make rational decisions, and that she refused to take her medication when she was not in the hospital, causing her to become increasingly delusional and out of touch. According to Dr. Rodriguez, at times Mrs. Grap could appear to be fairly lucid, but might nonetheless be in a delusional state. After hearing this testimony, the district court found that Mrs. Grap possessed the mental capacity to make a rational decision as to whether to give or withhold her consent to the warrantless search, and denied Grap's motion to suppress physical evidence.

As indicated, in February 2004, Grap entered a conditional plea of guilty to the possession charge. Thereafter, a presentence investigation report (PSR) was prepared. The probation officer who prepared the PSR concluded that Grap was a "prohibited person," essentially a drug user, as

defined by the statute, and recommended upward adjustments to his base offense level under U.S.S.G. §§ 2K2.1(a)(6) and 2K2.1(b)(4). At sentencing, Grap objected to these enhancements. During the hearing, the probation officer testified that she had conducted a presentence interview with Grap in the presence of his attorney. In this interview, she reported, Grap had admitted to using marijuana since the age of 19, and to using cocaine and crack for one year from the age of 21 or 22, but had claimed to have stopped using cocaine when he was arrested and placed on bond in Winnebago County. The probation officer admitted that she never asked Grap whether he used controlled substances up to and including March or May of 2002, and that she never asked him after which of his three arrests he had stopped using cocaine. The sentencing judge also heard testimony concerning Grap's drug use from Courtney Hamilton, Grap's ex-girlfriend, who testified that she had used marijuana and cocaine on a regular basis with Grap in March of 2002. Hamilton also testified that, while at Grap's apartment in March of 2002, she had observed him with a gun and a file, and that Grap had told her that he was going to file the serial numbers off the gun. Hamilton conceded, however, that she could not see what Grap was filing, and also acknowledged that her recollections of the events of March 2002 were hazy since she had had a substance abuse problem at that time.

Based upon this testimony and the PSR, the district court found that Grap was a "prohibited person" and set his base offense level under U.S.S.G. § 2K2.1(a)(6), increasing it by two levels under U.S.S.G. § 2K2.1(b)(4) since the offense involved stolen firearms. It also applied an additional 2-level enhancement under U.S.S.G. § 2K2.1(b)(4), finding that the firearms involved in the offense were stolen. Finally, based on Hamilton's testimony, the district court imposed an additional 4-level enhancement under U.S.S.G. § 2K2.1(b)(5), finding that Grap had possessed a firearm in

connection with the offense of obliterating its serial number, a felony under Illinois law. Grap also received a 3-level downward adjustment for acceptance of responsibility. Based on these calculations, which produced an offense level of 19, and a finding that Grap's criminal history category was III, the district court determined Grap's sentencing guideline range to be 37 to 46 months, and sentenced him to 40 months' imprisonment.

## II.

On appeal, Grap contends that the district court erred in denying his motion to suppress physical evidence since his mother lacked the requisite mental capacity to consent to a warrantless search, and that the enhancements to his sentence violate *Booker*.

## A.

Grap's first argument is that the district court incorrectly found that his mother had voluntarily consented to Detective Gallagher's warrantless search of the garage. He contends that the government's only evidence of voluntary consent was the subjective impressions of the officer who conducted the warrantless search, and claims that such subjective impressions are not determinative. *United States v. Elrod*, 441 F.2d 353, 355 (5th Cir. 1971). Grap contends that the evidence as a whole shows that Mrs. Grap's psychosis rendered her unable to grant consent to a search. We disagree.

On the appeal of a district court's denial of a motion to suppress, we review legal conclusions *de novo* and findings of fact for clear error. *United States v. Robeles-Ortega*, 348 F.3d 679, 681 (7th Cir. 2003). While the Fourth Amendment protects against unreasonable searches and seizures, warrantless searches are not *per se* unreasonable and are con-

stitutional under the Fourth Amendment if "an authorized individual voluntarily consents to the search." *United States v. Duran*, 957 F.2d 499, 501 (7th Cir. 1992) (citing *Florida v. Jimero*, 500 U.S. 248 (1991)). It is well-settled that a third party who has "actual or apparent authority over the defendant's property" has the authority to consent to a search. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990); *United States v. Basinki*, 226 F.3d 829, 833 (7th Cir. 2000). The government bears the burden of proving by a preponderance of the evidence that consent was freely and voluntarily given. *Basinki*, 226 F.3d at 833.

Whether a consent is voluntary is dependent upon the totality of circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973). Among the factors that aid in determining whether consent was freely given are the age, education, and intelligence and (applicable here) mental health and capability of the person giving consent; whether the person giving consent did so immediately or only after repeated requests by the police; whether physical coercion was used to obtain consent; and whether the person giving consent was in custody. *United States v. Strache*, 202 F.3d 980, 985 (7th Cir. 2000) (internal citations omitted). We also consider whether the officer advised the person asked to give consent of her right to refuse, although the absence of this factor is not fatal to the government's proof of voluntary consent. *Schneckloth*, 412 U.S. at 249.

Applying these principles to the facts of this case, we find that Detective Gallagher properly obtained Mrs. Grap's voluntary consent to search the Grap premises. While he did not possess a warrant to search the Grap residence, he informed Mrs. Grap that he believed that there was stolen property in her garage, asked her permission to search and then produced a consent form and read it aloud to Mrs. Grap. The facts on the record show that Detective Gallagher's failure to advise Mrs. Grap of her right to refuse to consent to the search does not undermine the voluntary nature of her consent.

The evidence also persuades us that, despite her mental infirmities, Mrs. Grap freely and voluntarily consented to Detective Gallagher's search, and that she was aware of all the relevant circumstances of the search and seizure of the stolen firearms. There is no allegation that Mrs. Grap lacked the authority to give consent to the warrantless search. And however potentially serious the effects of her psychosis, Mrs. Grap's behavior did not indicate that she lacked the requisite mental capacity to consent. When Detective Gallagher informed her of his belief that stolen property was in her garage without disclosing the nature of the property, Mrs. Grap asked him whether he was searching for guns. Mrs. Grap also signed both the consent form and the receipt, and opened the door of the garage with a garage door opener. Once Detective Gallagher had recovered the rifles, Mrs. Grap mentioned that the guns might belong to her husband, and had the good sense to inform Detective Gallagher that her husband kept his guns in their bedroom and, after checking, to confirm that her husband's guns were indeed in this location. This behavior would clearly indicate to a reasonable observer that Mrs. Grap sufficiently understood the consequences of her consent. And reasonableness is the touchstone of validity of third-party consent to a search. *See Rodriguez*, 497 U.S. at 182.

Grap's contention that Detective Gallagher's "subjective" impressions are irrelevant under *United States v. Elrod, supra*, is unpersuasive. In *Elrod*, the Fifth Circuit suppressed physical evidence of a bank robbery that police officers had uncovered in a warrantless search of a hotel room that was occupied by the defendant and codefendant, finding that the codefendant, who suffered from schizophrenia, lacked mental capacity when he consented to the warrantless search. The Fifth Circuit explained its holding by asserting that, "[n]o matter how genuine the belief of the officers is that the consentor is apparently of sound mind, and deliberately acting, the search depending on his

consent fails if it is judicially determined that he lacked mental capacity." 441 F.2d at 355. However, the Fifth Circuit also noted that the "question was one of mental awareness so that the act of consent was the consensual act of one who knew what he was doing and had a reasonable appreciation of the nature and significance of his actions." *Id.* at 355.

Apparently not following some of the language of *Elrod*, however, the Seventh Circuit views the relevance of the officer's observations in a different light. Thus, in *United States v. Strache*, *supra*, the defendant, who was allegedly mentally ill and suicidal at the time of the search, sought to suppress evidence of explosives that police had uncovered in a warrantless search of his bedroom by claiming that his mental condition rendered him incapable of giving free and voluntary consent. We disagreed, finding that the defendant's consent was voluntary based on police officers' testimony that the defendant was clear and lucid and had behaved in a relaxed and cooperative manner. In *Strache*, the impressions presented to the officers were undeniably relevant and, in fact, determinative in our analysis of whether the consent was voluntary under the totality of the circumstances. We determined that the officers' conclusions of voluntariness were *reasonable* in light of the defendant's behavior, as presented to the officers.

Crucially, the apparent difference between the approaches to voluntary consent in *Strache* and *Elrod* stems from the weight to be accorded the evidence presented to a reasonable officer asking for consent as opposed to some other facts, unknown to the officer, but later argued to the reviewing court. There may be an inference in *Elrod* that this after-presented evidence is strongly relevant, but in the *Strache* approach, it would be relevant only to impeach the credibility of the officer or to shed any light on what was reasonably apparent to him when he obtained the consent. The standard of what is reasonably apparent to a reasonable inquiring

officer, with its emphasis on the deterrence rationale of the exclusionary rule, is the correct approach. The purpose of suppression of evidence obtained in an unreasonable search is to deter violations by officers of the Fourth Amendment. Obviously, they cannot be deterred by circumstances that are unknown to them, like the psychiatric history of the person consenting to a search. *See United States v. Merritt*, 361 F.3d 1005, 1009 (7th Cir. 2004) (reversed on other grounds) (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)). Thus, the exclusionary rule should not be applied when its application will not result in "appreciable deterrence." *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)).

Here, an *Elrod*-type judicial finding that Mrs. Grap's mental condition, as determined by psychiatric testimony, prevented her from having the requisite mental capacity to voluntarily consent to a warrantless search might be of academic interest, but it has little to do with regulating police conduct. The proper inquiry here focuses upon the objective facts, as presented to a reasonable inquirer, that would reasonably put him or her on notice that a voluntary consent could not be given.

Of course, in addition, the mental capacity of the person giving consent is only one factor in evaluating his capacity to give voluntary consent. And "[i]t should not be assumed . . . that anyone suffering from some type of mental disease or defect is inevitably incapable of giving a voluntary consent to a search." 4 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 8.2(e), at 93 (4th ed. 2004). Modern medicine allows those suffering from even severe forms of mental illness, including, apparently, Mrs. Grap, to control their conditions through medication. Though Mrs. Grap has a history of refusing to take prescribed medication, her behavior provides no indication that she was suffering from delusional symptoms, or that she was "out of touch" with reality. On the contrary, she acted as if she were profoundly aware of events as they unfolded.

Our approach to the question of mental capacity to consent to a search may be analogized to the issue of apparent authority addressed in *Illinois v. Rodriguez, supra.* That case holds that a person with *apparent* authority (that is, a person having the *indicia* of agency as opposed to one actually authorized) may validly consent to a search. "[E]ven if [the purported agent] did not in fact have authority to give consent, it suffices to validate the entry that the law enforcement officers reasonably believed she did." *Rodriguez,* 497 U.S. at 182.

For these reasons, we cannot say that the district court erred in finding that Mrs. Grap voluntarily consented to Detective Gallagher's warrantless search of the garage, and therefore affirm its denial of Grap's motion to suppress.

## B.

Grap's second argument on appeal is that the district court committed constitutional error in finding by a preponderance of the evidence that he was a "prohibited person" and that he possessed a firearm in connection with another felony, and in applying two enhancements based on these findings. We conclude that, under *United States v. Booker*, the district court committed plain error when it increased Grap's sentence on the basis of these findings, and so order a limited remand to the district court under *United States v. Paladino* to permit the sentencing judge to reconsider this determination. No. 03-2296, 2005 WL 435430, at *10 (7th Cir. Feb. 25, 2005).

In resolving this claim, we first review the district court's factual findings in support of the obstruction of justice enhancement for clear error. *United States v. Girardi*, 62 F.3d 543, 547 (7th Cir. 1995). We then address whether Grap's sentence violates the Sixth Amendment right to trial by jury in federal criminal cases, as interpreted in *Booker, supra.*

For purposes of U.S.S.G. § 2K2.1(a)(6), a "prohibited person" denotes any person prohibited from possessing a firearm under 18 U.S.C. § 922(g). *See* U.S.S.G. § 2K2.1(a)(6), comment n.6. As 18 U.S.C. § 922(g)(3) provides, unlawful users of controlled substances are prohibited from possessing firearms, and thus qualify as "prohibited persons" under U.S.S.G. § 2K2.1(a)(6). Though we have not had occasion to address this issue, other circuits have determined that an individual's status as a prohibited person is ascertained as of the time he committed the instant offense, necessitating that Grap's drug use be "contemporaneous with his firearm possession." *United States v. Bennett*, 329 F.3d 769, 776-77, (10th Cir. 2003); *United States v. Nevarez*, 251 F.3d 28, 30 (2d Cir. 2001).

The district court imposed both the "prohibited person" enhancement and the 4-level enhancement for possessing a firearm in connection with another offense (here, attempting to deface a firearm) based on the facts in the PSR as well as the testimony of the probation officer and Hamilton, Grap's ex-girlfriend. But Grap never admitted to the relevant factual details of this testimony, nor were they found by a jury beyond a reasonable doubt. Thus, the district court was not authorized to make these findings. *United States v. Booker*, 543 U.S. at ___, 125 S. Ct. at 756 (affirming *Apprendi v. New Jersey*, 530 U.S. 466 (2000)).

Continuing the analysis under *Booker*, we review Grap's claim for plain error since he made no objection in the district court. 543 U.S. at ___, 125 S.Ct. at 769. As we held in *United States v. Nance*, in conducting a plain error analysis, "we must decide (1) whether there is error at all, (2) whether it was plain, (3) whether it affected the defendant's substantial rights, and (4) whether (if the first three factors are present) it seriously affected the fairness, integrity, or public reputation of the judicial proceedings." 236 F.3d 920, 824 (7th Cir. 2000) (citing *Johnson v. United States*, 520 U.S. 461, 466-67 (1997)).

The government concedes in its supplemental brief that the district court committed an error which was plain by adjusting Grap's sentence upward under mandatory guidelines based upon its own findings under the preponderance of the evidence standard. However, it argues, Grap cannot show that his substantial rights were violated since he cannot prove that the district court would have imposed a lesser sentence had it been free to do so.

We find, however, that it is impossible to determine the effect of this error upon Miller's sentence without consulting the sentencing judge, who "might well have decided to impose a lighter sentence than dictated by the guidelines had he not thought himself bound by them, [and so] his error in having thought himself bound may have precipitated a miscarriage of justice." *Paladino*, 2005 WL 435430, at *9. Thus, under *Paladino*, we order a limited remand to the district court "to permit the sentencing judge to determine whether he would (if required to resentence) reimpose his original sentence." *Id.* at *10. If the sentencing judge determines that Miller's sentence should be reimposed, "we will affirm the original sentence against a plain-error challenge provided that the sentence is reasonable." *Id.* If, however, the sentencing judge determines that he would have imposed a different sentence under an advisory scheme, "we will vacate the original sentence and remand for resentencing." *Id.*

## III.

Having found that Grap's mother freely and voluntarily consented to a warrantless search of her premises, we AFFIRM the district court's denial of Grap's motion to suppress. However, because the district court committed plain error by adjusting Grap's sentence upward based on facts found by the sentencing judge under the preponderance of the evidence, in violation of *Booker*, we order a limited REMAND to the district court under *Paladino* to permit the

sentencing judge to determine whether to reimpose his original sentence.

A true Copy:

　　　Teste:

　　　　　　　　　　_____

　　　　　　　　　　*Clerk of the United States Court of*
　　　　　　　　　　*Appeals for the Seventh Circuit*