In the

# United States Court of Appeals
## For the Seventh Circuit

No. 12-3763

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TIMOTHY L. RICHARDS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:10-cr-00006-TLS-1 — **Theresa L. Springmann**, *Judge.*

ARGUED OCTOBER 31, 2013 — DECIDED JANUARY 31, 2014

Before BAUER, MANION, and ROVNER, *Circuit Judges.*

BAUER, *Circuit Judge.* Timothy L. Richards ("Richards") was
charged in a four-count indictment with (1) possession of a
controlled substance with intent to distribute, (2) maintaining
a residence or place for the purpose of using and distributing
controlled substances, (3) possession of a firearm in further-
ance of a drug trafficking crime, and (4) being a felon in
possession of a firearm. Prior to trial, the district court denied
Richards' first and second motions to suppress evidence that

the police seized without a search warrant at the time of his arrest. After trial, a jury convicted Richards of all four charges.

Richards now appeals the district court's decisions to allow the government to introduce the seized evidence and raises two issues. First, Richards argues that the district court erred when it found that Edward Rawls ("Rawls") had the mental capacity to consent to the warrantless search of his home. Second, Richards argues that the district court erred when it found that (1) Rawls had apparent authority to consent, and even if Rawls did not have the requisite authority to consent, (2) exigent circumstances validated the warrantless search of a bedroom Richards used in Rawls' house. For the following reasons, we find no error.

## I. BACKGROUND

On December 8, 2009, Fort Wayne Police Department Officers Phillip Ealing and Dale Llewellyn attempted to execute an arrest warrant for Paul Wilson ("Wilson"). While in uniform and on patrol, the officers talked to several individuals who said they had seen Wilson frequently enter and leave a particular residence on the corner of Jefferson Boulevard and Hanna Street. When the officers arrived at the described house, Officer Llewellyn knocked on the door. An individual named "Diaz" opened the door and invited the officers inside to speak with the homeowner, Rawls.[1] The officers did not have a

---

[1] Rawls is the uncle of Richards. At the time of the incident, Rawls was eighty-six years old; an advanced age, but not one that requires a mental test to be considered reasonably reliable.

search warrant for the residence or an arrest warrant for anyone other than Wilson.

The officers went inside to talk with Rawls and noticed that there were several people in the house. The officers asked Rawls if Wilson was present. Rawls told the officers that he was not, but gave them permission to look around the house to confirm. The officers encountered several people as they walked through the house, but Wilson was not one of them.

When they entered the kitchen, the officers smelled the strong odor of burnt marijuana. Richards and another man sat at the kitchen table. Officer Ealing testified that he saw what he thought was a rock of crack cocaine on a plate next to a microwave oven. Officer Llewellyn testified that he saw a marijuana cigarette, a small amount of marijuana, drug paraphernalia, and plastic baggies on the kitchen table. All of these items were in plain view.

Officer Llewellyn told Richards to stand up so that he could conduct a protective pat down for weapons, but Richards refused. The verbal confrontation escalated into a physical struggle between the two; at one point, Officer Ealing used pepper spray to subdue Richards. The officers then handcuffed Richards and lifted him to his feet. When they did so, a handgun fell from his waistband onto the floor. Officer Ealing also discovered a knife sticking out of Richards' back pocket.

After the altercation with Richards, the officers called for backup and conducted a protective sweep of the house. Officer Llewellyn entered the west bedroom that Richards stayed in when he visited his uncle. The door frame had a hasp and padlock, but the door was unlocked at the time Officer

Llewellyn entered the room. Once inside, he saw an open briefcase on the bed containing what he believed to be cocaine.

After the officers finished the sweep, backup arrived. Officer Llewellyn and Detective Shane Pulver asked Rawls if he would give written consent to search his home. Before giving him the consent form, Detective Pulver read Rawls his *Miranda* rights. Rawls was never handcuffed or detained. Officer Llewellyn then gave Rawls time to read the consent form on his own and read portions of the form aloud to Rawls as well. Officer Llewellyn informed Rawls of his right to refuse consent and his right to seek legal counsel. Rawls told the officers that he understood his rights and willingly signed the consent form on the officers' first request to do so.

Throughout their interaction with Rawls, the officers did not notice anything unusual about his behavior. Officer Ealing was a member of the Fort Wayne Crisis Intervention Team and had received specialized training on how to identify people who suffer from mental illnesses. Neither officer observed signs that Rawls was experiencing any kind of dementia or confusion. Additionally, neither officer noticed any slurred speech, detected the smell of alcohol on Rawls' breath or discerned an indication that Rawls was intoxicated.

Richards was arrested and charged with (1) possession of a controlled substance with intent to distribute, in violation of 21 U.S.C. § 841(a)(1); (2) maintaining a residence or place for the purpose of using and distributing controlled substances, in violation of 21 U.S.C. § 856(a)(1); (3) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c); and (4) possession of a firearm having previously been

convicted of a felony offense, in violation of 18 U.S.C. § 922(g)(1).

In July 2010, Richards filed a motion to suppress evidence seized by police during his warrantless arrest. After an evidentiary hearing, the district court found that Rawls voluntarily provided valid consent for the police to search his residence and denied Richards' motion. In February 2011, Richards filed a second motion to suppress, arguing that Rawls lacked authority to consent to a search of the bedroom that Richards used when he stayed with Rawls. After an evidentiary hearing, the district court denied Richards' second motion to suppress on two separate grounds. First, the court found that Rawls had apparent authority to consent to the search of the bedroom. The court also found that exigent circumstances justified the officers' protective sweep of the bedroom. After a jury convicted Richards of all four counts, the court sentenced him to a total term of 180 months in prison followed by six years of supervised release.

## II. DISCUSSION

When reviewing a district court's denial of a motion to suppress, we review legal conclusions *de novo*. *United States v. Huddleston*, 593 F.3d 596, 600 (7th Cir. 2010). We review the district court's factual findings for clear error and will only reverse if the findings leave this Court with a "definite and firm conviction that a mistake has been made." *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994). Mixed questions of law and fact are reviewed *de novo*. *United States v. Gevedon*, 214 F.3d 807, 810 (7th Cir. 2000).

### A. Richards' First Motion to Suppress

Richards argues that the district court erroneously found that Rawls had the requisite mental capacity to freely and voluntarily consent to the officers' search of his home. Whether an individual's consent to a search was voluntary is a factual determination, which we review for clear error. *United States v. Johnson,* 495 F.3d 536, 541 (7th Cir. 2007). Relying on testimony from the suppression hearing, Richards argues that Rawls was incapable of consenting to the officers' search because his advanced age of eighty-six years left him a confused old man who was out of touch with reality. We disagree.

Our analysis begins with the presumption that warrantless searches or arrests within a home are unreasonable and violate the Fourth Amendment. *Payton v. New York,* 445 U.S. 573, 576 (1980); *Johnson v. United States,* 333 U.S. 10, 14 (1948). However, warrantless searches or arrests are constitutionally permissible when a "narrowly proscribed" exception exists. *United States v. Bell,* 500 F.3d 609, 612 (7th Cir. 2007). One such exception exists when "an authorized individual voluntarily consents to the search." *United States v. Duran,* 957 F.2d 499, 501 (7th Cir. 1992). The government must prove "by a preponderance of evidence that consent was freely and voluntarily given." *United States v. Grap,* 403 F.3d 439, 445 (7th Cir. 2005).

It is uncontested that Rawls, as the homeowner, was authorized to consent to the officers' search of his house. Rawls unequivocally consented; when the police asked him if they could search the house, he said "search." The issue remains, however, whether Rawls had the mental faculties about him on

December 8, 2009, to freely and voluntarily consent to the search.

Whether a third-party's consent is voluntarily given to the police is a question of fact that depends on the totality of circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). To determine whether consent was provided voluntarily, we consider (1) Rawls' age, education, and intelligence; (2) whether Rawls was informed of his constitutional rights; (3) whether Rawls was in custody; (4) how long he was detained; (5) whether Rawls consented immediately or after police made several requests; and (6) whether the police used physical coercion. *United States v. Strache*, 202 F.3d 980, 985 (7th Cir. 2000); *Schneckloth*, 412 U.S. at 226. We review these factors in the light of "objective facts, as presented to a reasonable inquirer, that would reasonably put him or her on notice that a voluntary consent could not be given." *Grap,* 403 F.3d at 445. Our determination does not depend on a single controlling factor, but carefully considers "all of the surrounding circumstances." *Schneckloth*, 412 U.S. at 226.

Richards attacks Rawls' capacity to freely and voluntarily consent based only on the first factor—age, education, and intelligence—because he contends that Rawls was an "old man out of touch with reality." This argument is not persuasive.

To guide our determination of whether Rawls voluntarily consented to the search, we consider the information known to the officers when they arrived at Rawls' house on the day in question. It was readily apparent to the officers that Rawls was an older gentleman because he clearly had difficulty walking. However, nothing occurred to put the officers on notice that

Rawls lacked the intelligence or the capacity to voluntarily consent to the search of his home. When Officers Ealing and Llewellyn first talked to Rawls, Rawls confirmed that he was the homeowner and invited the officers to search for Wilson. Rawls was accompanied by two other men during this conversation, and neither of them expressed any concerns about Rawls' mental condition. Officer Ealing testified that he did not observe any signs of dementia during his interaction with Rawls. Officer Llewellyn testified that he did not notice any signs that Rawls suffered from mental problems either. Rawls did not make any inappropriate comments or act in a way that would lead the officers to believe he was confused, delusional, or unable to consent. We find nothing that would have put a reasonable officer on notice that Rawls' mental state was so impaired that he could not provide voluntary consent to the impending warrantless search.

After Richards' arrest and the discovery of drugs, the officers again conferred with Rawls and asked him to sign a written consent form. Detective Pulver then read Rawls his *Miranda* rights and discussed the consent form with him. Rawls told Officer Llewellyn that he could read and write.[2] Officer Llewellyn read portions of the consent form to Rawls and informed him of his right to an attorney and his right to refuse consent. Rawls then signed the consent form. Officer Llewellyn and Detective Pulver testified that Rawls did not seem confused or disoriented and was aware of the events that

---

[2]  At the suppression hearing, it was discovered that Rawls was not literate, however, Officer Llewellyn had no reason to doubt the veracity of Rawls' statement at the time.

were unfolding. The district court found the officers' impressions of Rawls "completely credible;" we find no error in the district court's finding.

Richards relies solely on Rawls' testimony at the August 18, 2010, suppression hearing to support his argument. Richards contends that Rawls lacked the mental competence to consent to a search because (1) his testimony included significant factual mistakes about the events on December 8, 2009, and (2) he contradicted himself repeatedly as he testified. To the contrary, the district court found that Rawls' testimony "largely corroborated the version of events related by Llewellyn, Ealing, and Pulver." Although Rawls' recollection of the events that occurred over eight months prior was not impeccable, we find that his testimony was not so garbled as to call into question his mental faculties on the day in question.

This case is similar to our decision in *Grap,* 403 F.3d at 445. In *Grap*, we held that a third-party freely and voluntarily consented to a detective's warrantless search even though she suffered from documented mental infirmities. *Id*. The detective informed Mrs. Grap that he believed her son, the defendant, was storing stolen property in her garage. *Id*. at 441. Before searching the garage, the detective had Mrs. Grap sign a written consent form. *Id*. The detective observed nothing unusual about Mrs. Grap's behavior that would lead him to believe that Mrs. Grap lacked the capacity to consent to the search of the garage. *Id.* Based on the detective's testimony, we found that Mrs. Grap's consent was valid. *Id.* at 445. We noted that a person's mental capacity is only one factor in determining whether someone's consent was voluntary, and that a person is not precluded from consenting to a warrantless

search simply because he or she suffers from a mental disease. *Id.* Our review is aimed at "regulating police conduct," and to achieve that objective, the appropriate standard is what objective facts were known to the inquiring officer at the time consent was given. *Id*.

In Richards' case, there is no evidence that Rawls suffered from a diagnosed mental disability or that officers had any reason to believe that he could not consent to the search of his home. Three officers testified about their interactions with Rawls; each concluded that Rawls appeared to understand his rights and be free of mental defects. Officer Ealing was specially trained to recognize symptoms of mental illness, and he testified that Rawls appeared to have "all his mental faculties about him." Without evidence of aberrant behavior from Rawls on December 8, 2009, we conclude that the district court's finding that Rawls was capable of voluntarily consenting to the officers' search was not clearly erroneous.

Richards also contends that Rawls could not voluntarily consent to the search on December 8, 2009, because he was too intoxicated. But the record lacks any evidence to support this contention. Rawls admitted that he drinks beer or wine on occasion, but never admitted drinking on the day in question. Furthermore, Officers Ealing and Llewellyn detected no signs that Rawls was intoxicated. Rawls' sister, Kathryn, testified that Rawls did not appear to be drunk when she arrived at the scene later that day. The district court found that "the evidence did not support Richards' contention that his uncle might have been so intoxicated on the day in question that he did not understand what was happening." We agree with the district court's conclusion.

Based on objective facts that were known to the officers on December 8, 2009, they reasonably concluded that Rawls freely and voluntarily consented to the search of his home. Thus, we hold that the search of Rawls' home falls within the consent exception to the warrant requirement and affirm the district court's denial of Richards' first motion to suppress.

## B.  Richards' Second Motion to Suppress

Having recognized Rawls' capacity to freely and voluntarily consent, our analysis turns to whether Rawls had the authority to consent to a search of the west bedroom. Whether Rawls had actual or apparent authority to consent to the search is a mixed question of law and fact, which we review *de novo*. *Gevedon*, 214 F.3d at 810. The government carries the burden of proof by a preponderance of the evidence that the officers reasonably believed that Rawls had sufficient authority over the west bedroom to consent to its search. *United States v. Matlock,* 415 U.S. 164, 177, n.14 (1974).

A defendant assumes the risk that a co-occupant may expose a common area of a house to a police search, as long as the co-occupant possesses "common authority over or other sufficient relationship to the premises or effects sought to be inspected." *Matlock,* 415 U.S. at 171. Common authority is not based on a property interest, but is a social concept based on whether the consenting person had joint access or control of the area being searched. *Id.* Because common authority is premised on mutual use, an ownership interest in the property to be searched does not necessarily suffice as actual authority on its own. *United States v. Evans*, 27 F.3d 1219, 1229–30 (7th Cir. 1994). A houseguest has an expectation of privacy,

*Minnesota v. Olson,* 495 U.S. 91, 99 (1990), and the possession of a key is a sign of actual authority over a room, *United States v. Rodriguez,* 888 F.2d 519, 522 (7th Cir. 1989).

It is undeniable that Rawls had a relationship to the west bedroom as the homeowner, however, Richards had been staying with Rawls approximately three times a week for eight months prior to his arrest. Richards alone stayed in the west bedroom, and he frequently locked the door with a padlock. Rawls did not have a key and had no access to the room unless Richards unlocked it. Richards had an expectation of privacy in the west bedroom because he was Rawls' houseguest and he alone had access to the room if it was locked. Therefore, we conclude that Rawls lacked actual authority to consent to a search of the west bedroom.

Even without actual authority, however, a warrantless search may still be permissible if consent is obtained from a third-party with apparent authority. *Illinois v. Rodriguez*, 497 U.S. 177, 188–89 (1990); *United States v. Rosario*, 962 F.2d 733, 737 (7th Cir. 1992). When determining whether an individual has apparent authority to consent, the court employs an objective standard; officers may conduct a search without a warrant if they "reasonably (though erroneously) believe" that the person consenting had authority over the premises. *Rodriguez*, 497 U.S. at 186. The touchstone of the inquiry is whether the officer reasonably believed that the person had authority to consent based on the facts known to him at the time. *Rodriguez*, 497 U.S. at 184*; United States v. Groves,* 470 F.3d 311, 319 (2006).

Rawls told Officers Ealing and Llewellyn they could look around his house to search for Wilson. Rawls did not tell the officers to avoid the west bedroom or restrict their search in any way. Rawls never informed the officers that he lived with anyone else. The padlock on the door to the west bedroom was unlocked at the time the officers searched the home. The officers were unaware Rawls did not have a key to the padlock. Thus, the officers' belief that Rawls had access to, and likewise, the authority over all of the rooms in his house was reasonable. It is "unjustifiably impractical to require the police to take affirmative steps to confirm the actual authority of a consenting individual whose authority is apparent. *Georgia v. Randolph*, 547 U.S. 103, 122 (2006) (citing *Illinois v. Rodriguez*, 497 U.S. 177 (1990)).

Richards contends that under *Randolph*, the officers' unreasonably believed Rawls had authority over the west bedroom. He argues that the presence of a padlock on the door to the west bedroom placed a duty on the officers to eliminate the possibility of an atypical living arrangement. Richards suggests that the officers should have asked Rawls why there was a padlock on the door before entering. This argument is misplaced.

There is nothing in this case that should have alerted the police to an atypical arrangement. Richards did not object to the officers' entry of the west bedroom. Rawls did not seek anyone's approval before letting the officers search the house. Rawls did not tell the officers they could not go in the west bedroom. None of the other occupants in Rawls' house told the officers that they were not permitted to enter the west bedroom. There were no signs posted that the west bedroom was

private or off limits. The door was unlocked at the time of the search. Richards never indicated that the padlock was his. Based on the facts known to the officers at the time, it was reasonable for them to believe that it was Rawls that placed the padlock on the door, not Richards. Once Rawls consented to a warrantless search, the officers were not required to "take affirmative steps to find a potentially objecting co-tenant before acting on the permission they already received." *Id.* at 122.

We hold that Rawls' apparent authority to consent to the search of his house was sufficient to permit the officers' warrantless search of the west bedroom, so we need not reach the issue of whether exigent circumstances justified the officers' search. We find no error in the district court's denial of Richards' second motion to suppress.

## III. CONCLUSION

The district court properly denied Richards' first motion to suppress evidence because Rawls validly consented to the officers' warrantless search of his house. The court properly denied Richards' second motion to suppress because Rawls had apparent authority to consent to a search of his entire home, including the west bedroom. Therefore, the district court's denials of Richards' motions to suppress are AFFIRMED.