In the

# United States Court of Appeals

### For the Seventh Circuit

No. 14-3785

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

EUGENE A. SWEENEY,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 14-CR-20 — **Lynn Adelman**, *Judge.*

ARGUED SEPTEMBER 11, 2015 — DECIDED MAY 9, 2016

Before BAUER, WILLIAMS, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Defendant Eugene Sweeney used
a gun to rob a Milwaukee tavern where he had worked before.
He was convicted of armed robbery under the Hobbs Act, 18
U.S.C. § 1951(a), brandishing a firearm during a crime of vio-
lence, 18 U.S.C. § 924(c), and possessing a firearm as a felon,
18 U.S.C. § 922(g)(1). He was sentenced as an armed career
offender under 18 U.S.C. § 924(e). Sweeney appeals both his
convictions and his sentence. He asserts that the district court

erred in denying his motion to suppress the firearm central to all three convictions, which was seized in a warrantless search of the common space in the basement of his apartment building. He also asserts his sentence is erroneous, both because the district court did not state or support with findings all conditions of supervised release and because he does not qualify as an armed career criminal.

We affirm the district court's denial of the motion to suppress the firearm, so Sweeney's convictions stand. Following recent case law concerning supervised release, however, we vacate Sweeney's sentence and remand for re-sentencing. We do not resolve Sweeney's challenge to the armed career criminal finding, which was first raised on appeal. That question should be addressed on remand, where both sides may develop a full record and the district court may consider whether the disputed legal issue matters to Sweeney's ultimate sentence.

## I.   *The Fourth Amendment Issue*

Sweeney's challenge to his convictions requires us to apply the Fourth Amendment to the police search of a common area of Sweeney's apartment building. A police officer searched the area without a warrant and found a handgun that matched the victim's description of the robber's gun. We review the facts and then explain why the search did not violate Sweeney's Fourth Amendment rights.

### A.   *The Robbery, Investigation, and Search*

On the morning of December 23, 2013, Melissa Baldus arrived at her job as general manager of Flannery's Pub in Milwaukee. She had a bank bag containing cash for the register. She entered Flannery's through an alleyway door and walked

downstairs to her office. A man then entered through the same door, came upon Baldus, drew a gun, and demanded the money. Baldus turned over the bank bag. The robber fled, and Baldus called the police. She offered a confident identification of the robber as Eugene Sweeney: Sweeney had previously worked a few short stints at Flannery's, and Baldus said she recognized him from his gestures, body movements, voice, and sunglasses. She also described the gun as black and silver with a red dot on the side. After obtaining Sweeney's address from Flannery's personnel records, three officers—Detective Delgado, Officer Gasser, and Officer Wilcox—went to Sweeney's apartment.

Details of the apartment building layout are relevant to the Fourth Amendment analysis. The building contains six apartments, two on each of three floors. Sweeney's apartment was on the second floor. The building has exterior doors at the front and rear that are usually closed and locked. In the back of the building is a common rear staircase that can be entered from the back of each apartment. Those stairs lead down to the first floor and on down to the basement.

At the bottom of the basement stairs to the left is an opening to a common area. Water heaters are lined up against the wall that runs along the staircase. Past those is a small crawl space underneath the stairs. To the right of the stairs is a shared laundry facility for the building tenants. They make frequent use of the laundry and often allow friends and neighbors to use the laundry as well.

When the police arrived looking for Sweeney, Officer Wilcox covered the rear door of the building. Detective Delgado and Officer Gasser entered through the front door, which had been propped open, and found Sweeney's apartment. After

they knocked, the door was eventually opened by Sweeney's girlfriend. While talking with her, the officers received a radio call from Officer Wilcox saying he had caught Sweeney trying to leave by the back door and taken him into custody. At that point, with consent from Sweeney's girlfriend, Detective Delgado entered and searched the apartment. Officer Gasser went through the apartment, out its rear door, and down the common rear staircase.

Our focus is Officer Gasser's search of the basement. He went down the stairs to the basement and turned left. He went past the water heaters to the crawl space under the stairs. There he found a black plastic bag containing a handgun, magazine, and ammunition. Ms. Baldus, the manager of Flannery's, later testified at trial that the handgun looked like the one used in the robbery. In searches of the apartment, Sweeney's car, and Sweeney himself, none of which are challenged here, the officers also found money and a pair of sunglasses matching the description of the robber's.

B. *The Motion to Suppress*

Sweeney moved to suppress the gun discovered in the basement. After an evidentiary hearing, a magistrate judge recommended suppression of the firearm. In light of the Supreme Court's recent decisions in *United States v. Jones*, 132 S. Ct. 945 (2012), and *Florida v. Jardines*, 133 S. Ct. 1409 (2013), the judge concluded that Officer Gasser trespassed upon Sweeney's property in retrieving the gun and thus conducted an unlawful search.

The government sought review before District Judge Adelman, who heard testimony from defense investigator William Kohl, defendant Sweeney, Officer Gasser, and the

owner of the apartment building. Sweeney testified that his lease entitled him to use the basement, though he said he had never before used the area to store personal property. When the owner was questioned about tenants using the basement for storage, however, he flatly replied that "there is no storage in the basement. If we find there's stuff in the basement, … then we ask them to remove it and not to use the basement for storage." The owner also said the basement was common space, associated with no apartment in particular. Judge Adelman denied the motion to suppress. He found that the basement search did not violate Sweeney's Fourth Amendment rights. At trial, the jury convicted Sweeney on all charges.

C. *Analysis of the Fourth Amendment Search*

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated … ." The text of the Fourth Amendment "indicates with some precision the places and things encompassed by its protections: persons, houses, papers, and effects." *Florida v. Jardines*, 569 U.S. —, 133 S. Ct. 1409, 1414 (2013) (citation and quotation marks omitted); see also *United States v. Jones*, 565 U.S. —, 132 S. Ct. 945, 950 (2012) (Fourth Amendment expresses "a particular concern for government trespass upon the areas ('persons, houses, papers, and effects') it enumerates").

Applying the Fourth Amendment to various common spaces in apartment buildings has been a source of considerable controversy. In cases decided before *Jardines*, we held that warrantless police intrusions into shared spaces in apartment buildings much like the basement here did not violate the

Fourth Amendment rights of tenants. *United States v. Villegas*, 495 F.3d 761, 767–68 (7th Cir. 2007) (internal duplex hallway); *United States v. Concepcion*, 942 F.2d 1170, 1172 (7th Cir. 1991) (shared entrance to apartment building); cf. *United States v. Boden*, 854 F.2d 983, 990 (7th Cir. 1988) (common area of rental storage unit facility). More recently, based on the intervening Supreme Court decision in *Jardines*, we have held that bringing a police dog to sniff for drugs outside an apartment door amounts to a search of the apartment interior that requires a warrant. *United States v. Whitaker*, — F.3d —, Nos. 14-3290, 14-3506, 2016 WL 1426484, at *4 (7th Cir. April 12, 2016).

Sweeney does not challenge any factual findings by the district court, so we accept them, but we review the district court's legal conclusions *de novo*. See *United States v. Richards*, 741 F.3d 843, 847 (7th Cir. 2014), citing *United States v. Huddleston*, 593 F.3d 596, 600 (7th Cir. 2010). We focus our attention on *Jardines*, where the majority and concurring opinions reflect two principal approaches to the Fourth Amendment's protection. Each casts light on the warrantless search of the apartment building basement here. We address first the approach focused on the common law of property and whether the police committed a trespass when conducting the search. See *Jardines*, 133 S. Ct. at 1413–18 (trespass to property); *Jones*, 132 S. Ct. at 949–54 (trespass to chattel). We then turn to the second approach, focused on whether the person challenging the search had a reasonable expectation of privacy in the location that was searched. See *Jardines*, 133 S. Ct. at 1418–20 (Kagan, J., concurring); *Jones*, 132 S. Ct. at 957–64 (Alito, J., concurring in the judgment).

1. *The Fourth Amendment and Trespass*

In recent years, the Supreme Court has revived a "property-based approach" to identify unconstitutional searches. *Jones*, 132 S. Ct. at 950; see also *id.* at 949 ("The text of the Fourth Amendment reflects its close connection to property … ."). Under this approach, where the government has "physically occupied private property for the purpose of obtaining information," its intrusion is a search subject to the Fourth Amendment. *Id.* at 949. In *Jones*, police officers trespassed upon an "effect"—a car—by attaching a GPS tracker to its chassis. In *Jardines*, officers trespassed upon a "house"—a home's porch—by conducting a dog-sniff at the front door.

To establish a Fourth Amendment violation under this approach, there must be some trespass upon one of the protected properties enumerated by the Constitution's text. This in turn requires courts to consider the scope of trespass at common law. *Jones*, 132 S. Ct. at 949 (Fourth Amendment case law historically "tied to common-law trespass"). Neither *Jones* nor the common law provides sharp boundaries for the meaning of trespass for our purposes. See Orin S. Kerr, *The Curious History of Fourth Amendment Searches*, 2012 Sup. Ct. Rev. 67, 90–91 (2012) ("The term 'trespass' could be understood as embracing a wide range of ideas."); see also *Kyllo v. United States*, 533 U.S. 27, 31–32 (collecting cases that analyze meaning of trespass in Fourth Amendment context). The Restatement approach to trespass is a good starting point. See Laurent Sacharoff, *Constitutional Trespass*, 81 Tenn. L. Rev. 877, 891 (2014) (endorsing Restatement (Second) of Torts as best authority for discerning meaning of trespass for *Jones* inquiry).

Under the relevant Restatement definition, trespass means that one "enters land in the possession of the other." Restatement (Second) of Torts § 158 (Am. Law Inst. 1965); see also *Jones*, 132 S. Ct. at 949, quoting *Entick v. Carrington*, 95 Eng. Rep. 807, 817 (C.P. 1765), for the proposition that "no man can set his foot upon his neighbour's close without his leave; if he does he is a trespasser, though he does no damage at all … ." Possession means "occupancy of land with intent to control it." Restatement (Second) of Torts § 157. And occupancy means to "manifest a claim of exclusive control of the land." Restatement (Second) of Torts § 157 cmt. a. Put together, then, to prove a claim of trespass, one must have possession of the property in question and the ability to exclude others from entrance onto or interference with that property.

Sweeney cannot show any trespass on his property. He did not have any form of exclusive control over the basement. The basement was a common space, used by a number of residents. His lease gave him no exclusive property interest in any part of the area. It did not even give him the right to store items there.

Nor could Sweeney have excluded someone from the basement. Suppose Sweeney had discovered a non-resident taking shelter in the basement who refused to leave. He could call his landlord for aid, but Sweeney himself could not sue the intruder for civil trespass on his property. See *State v. Dumstrey*, 859 N.W.2d 138, 144 (Wis. App. 2014), *aff'd*, 873 N.W.2d 502 (Wis. 2016), quoting *State v. Nguyen*, 841 N.W.2d 676, 681 (N.D. 2013), for the proposition that tenant has no right to exclude "technical trespassers in the common hallways" of apartment building.

Rather, as Judge Adelman explained, any such trespass would be a trespass against the building owner, not against any individual tenants. See, e.g., *Aberdeen Apartments v. Cary Campbell Realty Alliance, Inc.*, 820 N.E.2d 158, 166 (Ind. App. 2005) (collecting cases holding that landlord can sue for trespass to common areas of multi-unit dwellings); *Commonwealth v. Thomas*, 267 N.E.2d 489, 491 (Mass. 1971) (collecting cases and affirming denial of motion to suppress under very similar circumstances); *Motchan v. STL Cablevision, Inc.*, 796 S.W.2d 896, 900 (Mo. App. 1990) (concluding that "a landlord, who retains control of common areas in a multi-tenant building, also retains possession of those areas so as to support an action for trespass to the common areas"). Only the building owner or landlord could bring suit, so only the owner or landlord could have objected to Officer Gasser's warrantless search of the crawl space under the stairs.

Accordingly, even if Officer Gasser committed a trespass, it was not Sweeney's right under long-established tort law to exclude him. But whether or not there was a trespass, Sweeney also faces a separate obstacle: he cannot establish that police set foot onto an area for which the Fourth Amendment affords Sweeney protection.

Not all trespasses by law enforcement are violations of the Fourth Amendment. See *Oliver v. United States*, 466 U.S. 170, 183–84 (1984). For instance, under the "open fields" doctrine an officer may search for evidence on private land not within close proximity to a home on the property. *Jardines*, 133 S. Ct. at 1414, citing *Hester v. United States*, 265 U.S. 57 (1924); *Andree v. Ashland County*, 818 F.2d 1306, 1315 (7th Cir. 1987). To violate the Fourth Amendment, the trespass must occur on a

"constitutionally protected area"—that is, one explicitly enumerated in the text of the Fourth Amendment. *Jardines*, 133 S. Ct. at 1414, quoting *United States v. Knotts*, 460 U.S. 276, 286 (1983) (Brennan, J., concurring). This includes the home, which extends to the "curtilage" of the home as well. *Id.*

The basement was not recognizable as curtilage of Sweeney's apartment. See *United States v. Redmon*, 138 F.3d 1109, 1128 (7th Cir. 1998) (en banc) (Evans, J., concurring) ("In a multi-unit apartment building there may in fact be no curtilage except perhaps in a separate area—like a basement storage locker—subject to one's exclusive control."). Other courts have held, often categorically so, that common basements of multi-unit buildings or closely related spaces are not part of the individual units' curtilage. *United States v. Brooks*, 645 F.3d 971, 975–76 (8th Cir. 2011) (staircase leading to shared basement space in apartment building); *United States v. King*, 227 F.3d 732, 753 (6th Cir. 2000) (basement of a two-family dwelling); *United States v. Cruz Pagan*, 537 F.2d 554, 558 (1st Cir. 1976) (common basement garage of condominium building); *Thomas*, 267 N.E.2d at 491 (basement of three-story, six-unit apartment building, containing common space with laundry facilities); see also Carol A. Chase, *Cops, Canines, and Curtilage: What Jardines Teaches and What It Leaves Unanswered*, 52 Houston L. Rev. 1289, 1303 (2015) ("Generally speaking, appellate courts that have considered whether common areas in a multi-family dwelling are part of the curtilage of a dwelling have been reluctant to recognize curtilage protection for those areas.").

It is not necessary to decide categorically here that the basement of a multi-unit residential building is or is not always the curtilage of individual units. It is enough to say that

it was not in this case. Curtilage is a common-law concept often defined in abstract terms. See *Jardines*, 133 S. Ct. at 1414–15 (curtilage includes all of the "branches and appurtenants" of the home), quoting 4 W. Blackstone, Commentaries on the Laws of England 223, 225 (1769); *id.* at 1415 (curtilage is that part of the property "intimately linked to the home, both physically and psychologically"), quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986); *United States v. French*, 291 F.3d 945, 951 (7th Cir. 2002) (curtilage is the "area outside the home itself but so close to and intimately connected with the home and the activities that normally go on there that it can reasonably be considered part of the home"), quoting *Siebert v. Severino*, 256 F.3d 648, 653–54 (7th Cir. 2001). At bottom, the underlying test is practical. If the Fourth Amendment shields the "right of a man to retreat into his own home" free from intrusion, then it must also protect against an officer "stand[ing] in a home's porch or side garden" like a bold snooper looking for evidence or peering through the windows. *Jardines*, 133 S. Ct. at 1414.

In most cases it is easy to say what the curtilage is. See *Jardines*, 133 S. Ct. at 1415. A porch, a small fenced-in yard, a gated walkway along the side of a house—all are obviously part of the curtilage. This common-sense understanding saves courts, police officers, and citizens from needing to apply nebulous, ad hoc, case-by-case standards with great uncertainty. *Oliver*, 466 U.S. at 181–82; *United States v. Redmon*, 138 F.3d 1109, 1138 (7th Cir. 1998) (en banc) (Rovner, J., dissenting).

When we encounter novel questions about the scope of curtilage, we take into account the four *Dunn* factors: "(1) the proximity of the area in question to the home; (2) whether the area is included in an enclosure surrounding the home; (3)

how the owner uses the area; and (4) the measures taken to protect the area from observation." *Bleavins v. Bartels*, 422 F.3d 445, 451 (7th Cir. 2005), citing *United States v. Dunn*, 480 U.S. 294, 301 (1987). In this case these factors show that the search here did not occur in any curtilage of Sweeney's apartment.

First, proximity: the basement was remote from the second-floor apartment, and Sweeney did not have a private basement storage space that was searched. There was no concern that officers might be able to prevent Sweeney from his right to "retreat into his own home" or that they could otherwise "observe his repose from just outside the front window." *Jardines*, 133 S. Ct. at 1414.

Second, an enclosure surrounding the home: Sweeney argues that the basement was within the "enclosure" of the apartment building's walls, accessible only from within the individual apartments or by a locked rear door. Under *Dunn*, though, the question is not whether the area at issue was within the walls of the building, but whether it was enclosed and intimate to Sweeney's apartment itself. It was not.

Third, the nature of the use: Sweeney had no particular use of the basement that tied it to his own apartment. It served primarily as a shared laundry facility and location for utilities for all tenants. Sweeney did not use it for activities "intimately linked" to his home.

Fourth, measures taken to protect the basement from observation by the public: This factor is a little more favorable to Sweeney. On one hand, as a basement space within a locked apartment building, it was unlikely to be seen by a member of the general public. On the other hand, there was no door to

the basement itself once one was inside the back of the building, and tenants often allowed outsiders into the basement to do laundry. There is no evidence that Sweeney himself took affirmative steps to protect the basement area from observation. See *State v. Dumstrey*, 873 N.W.2d 502, 514 (Wis. 2016) (noting, in context of apartment parking garage, the curtilage inquiry "is not whether the [area] is generally shielded from the public at large," but rather whether the person "has taken steps to shield the [area] from the view of passersby within the [area]"). While this last factor gives Sweeney a little ground for argument, when all factors are taken together, the basement was not within the curtilage of Sweeney's apartment. The trespass or property-right theory for Fourth Amendment protection did not give Sweeney any rights in the basement crawl space.

### 2. *The Fourth Amendment and Expectations of Privacy*

Neither party contends that Sweeney had a reasonable expectation of privacy in the basement of the apartment building, but we address the issue briefly in light of our recent decision in *United States v. Whitaker*, — F.3d —, Nos. 14-3290, 14-3506, 2016 WL 1426484 (7th Cir. April 12, 2016). As the district court noted, there is generally no reasonable expectation of privacy in shared and common areas in multiple-dwelling residential buildings. *Harney v. City of Chicago*, 702 F.3d 916, 925 (7th Cir. 2012) (walkway adjacent to condominium building but behind gate), citing, for instance, *United States v. Villegas*, 495 F.3d 761, 767–68 (7th Cir. 2007) (internal duplex hallway); see also *United States v. Dillard*, 438 F.3d 675, 683 (6th Cir. 2006) (collecting cases from circuit courts establishing lack of reasonable expectation of privacy in common areas of apartment buildings).

Here, where the basement space was "shared by all of the tenants" of the apartment building, see *Harney*, 702 F.3d at 925, there was no individualized storage space and no door or locked entry to the basement itself, it was not objectively reasonable that the space would be assumed private. This is true even though the exterior door of the building was locked to exclude persons who are not tenants of the building; the critical factor is that multiple tenants could enter and use the space. *Id*.

This reasoning does not mean that law enforcement can freely use common spaces in apartment buildings to intrude into the privacy of apartment interiors. In *Whitaker*, police officers brought a drug-sniffing dog into an apartment hallway and had the dog sniff a particular apartment door. We held that the dog-sniff at the entrance was a search of the apartment itself and subject to the Fourth Amendment warrant requirement, just as the use of other sense-enhancing technology would be. *Whitaker*, — F.3d at —, 2016 WL 1426484, at *3 (comparing dog-sniff to use of heat-sensing device, binoculars, or stethoscope to look into or listen to interior). Officer Gasser's search of the basement crawl space in this case posed no similar danger of intrusion into the protected privacy of an apartment interior. Accordingly, the district court correctly denied the motion to suppress the firearm.

II. *Sentencing Issues*

Judge Adelman found that Sweeney was an armed career criminal, which required a mandatory minimum sentence of twenty-two years (fifteen years on the firearm possession charge, and a consecutive seven years for brandishing during a crime of violence). The judge sentenced Sweeney to the mandatory minimum twenty-two years in prison, followed

by three years of supervised release with standard conditions and several special conditions.

A.  *Supervised Release Issues*

In imposing the terms of supervised release, the district court followed practices long used by district judges in this circuit and around the country. The judge said he was imposing the "standard conditions" of supervised release without reciting each of them, without obtaining a waiver of such recitation, and without specifically explaining his reasons for imposing each of them. The judge imposed several special conditions of supervised release, including substance abuse treatment, mental health treatment, and payment of restitution, and provided terse but obviously sound reasons for them. This was a violent crime committed by a man with a history of armed violence, substance abuse, and mental health problems, and who would not be able to pay restitution immediately. The judge did not explain his reasons for prohibiting Sweeney from possessing a firearm or dangerous weapon as a condition of supervised release, but there was no need to belabor the obvious.

In a recent series of decisions, however, this court has been subjecting the imposition of supervised release conditions to much closer scrutiny than had been common, and we have done so even when no objections have been raised in district courts. In particular, see *United States v. Siegel*, 753 F.3d 705 (7th Cir. 2014); *United States v. Thompson*, 777 F.3d 368 (7th Cir. 2015); *United States v. Sewell*, 780 F.3d 839 (7th Cir. 2015); *United States v. Kappes*, 782 F.3d 828 (7th Cir. 2015); but cf. *United States v. Silvious*, 512 F.3d 364, 371 (7th Cir. 2008) (finding no plain error where district court imposed special condi-

tions of supervised release that were overly broad). The district court neither stated all the conditions orally nor obtained a waiver for doing so, and did not provide any explanation for many of the conditions. In addition, some of the specific conditions imposed here have been found too vague or otherwise improper, though our circuit law is evolving with respect to some of those conditions, such as the requirement that the defendant answer truthfully all inquiries by the probation officer and permit the probation officer to visit his home at any time. See, e.g., *United States v. Douglas*, 806 F.3d 979, 985–86 (7th Cir. 2015); *United States v. Armour*, 804 F.3d 859 (7th Cir. 2015) (condition that probation officer could visit anytime between 6 a.m. and 11 p.m.). Based on the logic of our recent cases, we must remand the case. We remand for a complete re-sentencing in light of the substantial questions raised in this appeal about Sweeney's status as an armed career criminal, as we explain next.

B.  *Armed Career Criminal Status*

The Armed Career Criminal Act provides that a person convicted of being a felon in possession of a firearm under 18 U.S.C. § 922(g) must receive a mandatory minimum sentence of fifteen years in prison if he is an armed career criminal. 18 U.S.C. § 924(e)(1). To qualify as an armed career criminal, the defendant must have had at least three prior convictions for either certain violent felonies or serious drug offenses. *Id.*

The district court found that Sweeney qualified for armed career criminal status on the basis of four violent felony convictions in his record: (1) a 1994 juvenile armed robbery, (2) a 1996 robbery, (3) a 1996 witness intimidation conviction, and (4) a 2005 burglary. The judge sentenced Sweeney to the fifteen-year mandatory minimum as an armed career criminal,

plus the mandatory consecutive seven years for brandishing a firearm during a crime of violence. There is no doubt that Sweeney's 1996 robbery conviction and 2005 burglary conviction were violent felonies. The legal question is whether either the 1994 juvenile armed robbery or 1996 witness intimidation qualifies as a third violent felony.

Sweeney did not raise objections to his armed career criminal eligibility during sentencing, so we would review the sentence only for plain error. *United States v. Thornton*, 463 F.3d 693, 700 (7th Cir. 2006). Sweeney has raised substantial questions about whether courts should use the categorical method or some other method to determine whether juvenile offenses qualify as violent felonies under 18 U.S.C. § 924(e)(2)(B) (defining "violent felony" as including an "act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device"). Some circuits have applied the categorical approach to juvenile acts. See, e.g., *United States v. Wells*, 473 F.3d 640, 646–50 (6th Cir. 2007); *United States v. Richardson*, 313 F.3d 121, 126–28 (3d Cir. 2002).

Both the *Wells* and *Richardson* courts explained that there are strong arguments both for and against applying the categorical approach to the firearm, knife, and destructive device element for juvenile cases. We have not yet decided this legal question, and a more complete airing of the facts and law concerning Sweeney's juvenile robbery conviction may shed more light on his case. Cf. *United States v. White*, 683 F. Supp. 2d 617, 620–25 (M.D. Tenn. 2010) (where use of firearm in predicate juvenile delinquency adjudication was disputed in district court, government offered *Shepard* materials showing defendant had been adjudicated guilty of using firearm in violent felony). Similarly, further development of the record on

Sweeney's conviction for intimidation of a witness may clarify whether it qualifies as a violent felony. Since the case must go back to the district court in any event and the stakes for the defendant are so great, we believe the better course is to remand for re-sentencing now rather than leaving the issues for a likely future petition under 28 U.S.C. § 2255 challenging the performance of defense counsel.

The district court may also wish to consider whether these issues ultimately make a difference to the appropriate sentence here. Even if the categorical approach to the armed career criminal issue might bar application of the statutory enhancements, the court could consider both of the disputed convictions and the underlying facts in exercising its judgment under 18 U.S.C. § 3553(a) within the unenhanced statutory ranges. E.g., *United States v. Sonnenberg*, 628 F.3d 361, 367–68 (7th Cir. 2010) (categorical approach required vacating of sentence under Armed Career Criminal Act, but on remand district court could consider actual facts under § 3553(a)).

The defendant's convictions are AFFIRMED, but his sentence is VACATED and the case is REMANDED for re-sentencing consistent with this opinion.