In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 16-2316 & 16-2467

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JASON CORREA and SAUL MELERO,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 11-CR-0750-1 & 11-CR-0750-2 — **Robert M. Dow, Jr.**, *Judge.*

ARGUED APRIL 6, 2018 — DECIDED NOVEMBER 5, 2018

Before EASTERBROOK, RIPPLE, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Members of a Drug Enforcement Agency task force lawfully found drugs in a traffic stop and seized several garage openers and keys they also found in the car. An agent took the garage openers and drove around downtown Chicago pushing their buttons to look for a suspected stash house. He found the right building when the door of a shared garage opened. The agent then used a seized

key fob and mailbox key to enter the building's locked lobby and pinpoint the target condominium. At the agent's request, another agent sought and obtained the arrestee's consent to search the target condo. The search turned up extensive evidence of drug trafficking. As we explain below, the use of the garage door opener was close to the edge but did not violate the Fourth Amendment, at least where it opened a garage shared by many residents of the building. At all other stages of the investigation, the agents also complied with the Fourth Amendment. We affirm the district court's denial of the defendants' motion to suppress the evidence of drug trafficking found inside the condominium.

I.   *Factual and Procedural Background*

Unless indicated otherwise, we adopt the district court's version of the facts from its initial order denying the motion to suppress. *United States v. Correa* ("*Correa I*"), No. 11 CR 0750, 2013 WL 5663804 (N.D. Ill. Oct. 17, 2013).

The investigation that led the DEA to defendants Jason Correa and Saul Melero began when a DEA confidential source obtained $500,000 in cash from two unidentified men. DEA agents tailed the men to a house a few miles away and put the house under surveillance. Eight days later, on October 27, 2011, agents followed one of the men (who drove the same car he had driven to meet the confidential source eight days earlier) to a grocery store in Chicago. With DEA task force members watching the parking lot and the grocery, the man parked his car next to a silver Jeep and then went into the grocery. The man met in a coffee shop inside the grocery with a man later identified as Correa. Six minutes later, the two men walked to the unidentified man's car. He retrieved a multi-colored bag and gave it to Correa, who put it in the silver Jeep.

Correa then drove away in the Jeep, tailed by task force officers in two unmarked cars. DEA Special Agent Thomas Asselborn radioed the officers and instructed them to stop Correa's car if they saw a traffic violation.

It did not take long.[1] The officer in the lead car, Mike Giorgetti, saw Correa turn left without signaling at 18th Street and Canal. After following Correa east across the Chicago River, Officer Giorgetti activated his lights and siren and pulled Correa over near the intersection of 18th Street and Wabash. Wearing a bulletproof vest marked "Police" on both sides, Officer Giorgetti approached the driver's side of Correa's car. The other task force officer, Steve Hollister, approached the passenger side. Officer Giorgetti asked Correa for his license and registration and asked Correa if he had anything illegal in the car. After Correa said no, Officer Giorgetti asked if he could search the car. Correa said "go ahead." Officer Hollister witnessed the exchange.

Officer Giorgetti found the multi-colored bag that the unidentified man had given to Correa moments earlier. In a bag inside that bag, Giorgetti found what he thought was cocaine. After finding the cocaine, the officers also found a bag on the front passenger seat containing four garage door openers, three sets of keys, and four cell phones. The officers then arrested Correa. After the officers arrested Correa, but before

---

[1] When he was Attorney General, the future Justice Jackson said, in explaining the importance of a prosecutor's fairness and impartiality: "We know that no local police force can strictly enforce the traffic laws, or it would arrest half the driving population on any given morning." R. Jackson, *The Federal Prosecutor, Address Delivered at the Second Annual Conference of United States Attorneys*, April 1, 1940, quoted in *Morrison v. Olson*, 487 U.S. 654, 727–28 (1988) (Scalia, J., dissenting).

they took him to the DEA office and gave him *Miranda* warnings, Agent Asselborn arrived on the scene and took the garage door openers and keys.

Agent Asselborn drove straight to 1717 South Prairie—the address where the unidentified men had taken the confidential source's car and left with $500,000 in cash eight days earlier. That was a dead end: none of the garage door openers worked at that address. Agent Asselborn spent the next ten to fifteen minutes testing the openers on various nearby buildings. He tested them on "a bunch of townhouses with garages attached to them right in that area." When that did not work, he "kind of did a grid system," testing the openers on multiple buildings starting west of South Michigan Avenue and working his way east to an alley just east of Michigan Avenue. Eventually, the garage door opened for a multi-story condominium building at 1819 South Michigan Avenue. Thinking that someone else might have opened the door, Asselborn backed up down the alley, waited for the door to go down automatically, and then activated the opener again. The door opened. Asselborn used the opener "a third time just to be sure," but he did not enter the garage.

The agents went to 1819 South Michigan Avenue. (They never did figure out what the other garage door openers opened.) Using a key fob from the same bag that had contained the garage door openers, agents entered the locked lobby of the building. They then tested mailbox keys from the same key ring on various mailboxes and found a match: Unit 702. Agent Asselborn contacted a supervisor who was back at the DEA office with Correa, to obtain Correa's consent for a search of Unit 702. The supervisor told Correa that the keys from the car matched Unit 702, asked if there was "anything

illegal" in the condominium, and then asked if Correa "minded if we check 1819 S. Michigan, Unit 702." Correa said "go ahead and search it," but he refused to sign a consent form.

Inside the condominium, the agents found a handgun and more than a kilogram each of cocaine and heroin, as well as quantities of marijuana, Ecstasy, and methamphetamine. They also found equipment for weighing and packaging drugs, and personal documents of Saul Melero's. *Correa I*, at *2. After a neighbor told agents that Saul Melero was one of the condominium's residents and was standing outside on Michigan Avenue, agents arrested him on the spot.

Correa and Melero were both charged with drug and firearm offenses. They moved to suppress all of the evidence, asserting numerous violations of their Fourth Amendment rights. After an evidentiary hearing, the district court denied the motion. *Correa I*, 2013 WL 5663804. The court also denied their motion to reconsider, *United States v. Correa* ("*Correa II*"), No. 11 CR 0750, 2014 WL 1018236 (N.D. Ill. Mar. 14, 2014), and their renewed motion to reconsider, *United States v. Correa* ("*Correa III*"), No. 11 CR 0750, 2015 WL 300463 (N.D. Ill. Jan. 21, 2015).

Correa pleaded guilty to charges of possession with intent to distribute various drugs, but he preserved his right to appeal the denial of the motion to suppress. The district court sentenced him to the mandatory minimum of ten years in prison. Melero went to trial, and a jury convicted him of possessing the drugs found in the condominium and for maintaining the condominium as a stash house. The district court sentenced Melero to eleven years in prison. Correa and

Melero both appeal. The central issue is the denial of their mo-
tion to suppress, though it raises many subsidiary issues.

II. *Analysis*

On appeal from a district court's ruling on a motion to
suppress, we review legal conclusions *de novo* and factual
findings for clear error. See *United States v. Contreras*, 820 F.3d
255, 261 (7th Cir. 2016). We accept the district court's credibil-
ity determinations "unless the facts, as testified to by the po-
lice officers, were so unbelievable that no reasonable fact-
finder could credit them." *Id.* at 263, citing *United States v.
Pineda-Buenaventura*, 622 F.3d 761, 774 (7th Cir. 2010); see also
*United States v. Rodriguez-Escalera*, 884 F.3d 661, 666–67 (7th
Cir. 2018) (affirming grant of motion to suppress where dis-
trict court declined to credit officer's explanation for extended
traffic stop). "A credibility determination will be overturned
only if credited testimony is internally inconsistent, implausi-
ble, or contradicted by extrinsic evidence." *Id.*, citing *Blake v.
United States*, 814 F.3d 851, 854–55 (7th Cir. 2016).

Our Fourth Amendment analysis follows the chronology
of the investigative chain. We begin with the traffic stop and
go on to the search of the car, the seizure of the garage door
openers and keys, and the agent's use of those openers and
keys to identify the right condominium, and we end with the
search of the condominium and Melero's arrest. We find that
the officers did not violate the Fourth Amendment at any step
along the way.

A. *Traffic Stop*

The officers lawfully stopped Correa for a traffic violation,
but our path to that conclusion is different from the district
court's. Rather than decide whether the officers had sufficient

grounds to stop Correa based on suspected drug activity, we find that Correa's traffic violation (turning without signaling) gave the officers probable cause for the traffic stop. That probable cause satisfies the Fourth Amendment's reasonableness requirement even if the officers were more interested in suspected drug trafficking than in dangerous driving on the streets of Chicago. See *United States v. Taylor*, 596 F.3d 373, 376 (7th Cir. 2010) (stop proper because driver's failure to wear seatbelt gave officers probable cause to believe driver committed traffic offense); see also *Whren v. United States*, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."), citing *Delaware v. Prouse*, 440 U.S. 648, 659 (1979), and *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977). That is why the stop was lawful even though Agent Asselborn acknowledged at the suppression hearing that the stop was a "pretext."

Correa argues that the stop was improper because he did not turn without signaling, because Officer Giorgetti's testimony that he saw the traffic violation is uncorroborated, and because, even if Officer Giorgetti saw the violation, he was outside of his jurisdiction and had no legal authority for the stop. We find no reversible error.

The conflict between Correa's testimony that he did signal and Officer Giorgetti's testimony that he did not presents an ordinary credibility issue. Judge Dow found that Officer Giorgetti's testimony was more credible than Correa's. *Correa I*, 2013 WL 5663804, at *3. That was not clearly erroneous. The judge could reasonably choose to believe the officer's testimony about what he saw, with or without corroboration.

The district court did not decide the traffic-law issues but instead held that the agents reasonably suspected a drug transaction. *Id.* at *3–4. We find that the stop was justified based on the traffic violation, so we do not decide whether the officers' suspicions of drug trafficking were enough to justify the stop.

Officer Giorgetti was a Willow Springs police officer acting as part of a DEA task force. See *id.* at *3. Under Illinois law, he could conduct a traffic stop outside his home municipality based on his observation of a turn made illegally without signaling. See *People v. Gutt*, 640 N.E.2d 1013, 1016 (Ill. App. 1994). Even if the stop had not complied with state law, that would not affect the constitutionality of the stop, for which the officer's observation of a traffic offense gave him probable cause, or the resulting search. See *Virginia v. Moore*, 553 U.S. 164, 176 (2008).

B.  *Search of the Car*

Next, the officers lawfully searched Correa's car because he gave them consent to do so. Because the original stop was lawful, Correa's consent to the search of the car was not tainted. Cf. *United States v. Cellitti*, 387 F.3d 618, 622 (7th Cir. 2004) ("Consent given during an illegal detention is presumptively invalid."). Correa argues that his consent was involuntary, but we see no reason to disturb the district court's credibility findings that led it to find his consent was voluntary. See *Correa I*, 2013 WL 5663804, at *4.

The search did not exceed the scope of Correa's consent. "The scope of consent is 'limited by the breadth of actual consent, and whether the search remained within the boundaries of the consent is a question of fact to be determined from the

totality of all the circumstances.'" *United States v. Long*, 425 F.3d 482, 486 (7th Cir. 2005), quoting *United States v. Raney*, 342 F.3d 551, 556 (7th Cir. 2003). Giorgetti asked Correa if he "had anything in the vehicle that I needed to be aware of, anything illegal." Correa said "no." Next, Giorgetti "asked Mr. Correa if he had a problem with me searching the vehicle and he said go ahead."

The bag containing the cocaine, inside the multicolored bag, was within the scope of Correa's consent. The district court found that Correa did not limit the scope of his consent, *Correa I*, 2013 WL 5663804, at *5, and that finding is not clearly erroneous. "As the Supreme Court has explained, the 'scope of a search is generally defined by its expressed object.'" *United States v. Thurman*, 889 F.3d 356, 368 (7th Cir. 2018), quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). Correa knew that Officer Giorgetti was looking for "anything illegal," so he had to have known that the officers could be looking for drugs. "Generally, consent to search a space includes consent to search containers within that space where a reasonable officer would construe the consent to extend to the container." *United States v. Melgar*, 227 F.3d 1038, 1041 (7th Cir. 2000), citing *Jimeno*, 500 U.S. at 251, *Wyoming v. Houghton*, 526 U.S. 295, 302 (1999), and *United States v. Ross*, 456 U.S. 798 (1982). The officers could reasonably understand Correa's unlimited consent to apply to a container that might contain drugs. E.g., *Jimeno*, 500 U.S. at 251–52 (general consent to search of car extended to paper bag on car floor); *United States v. Saucedo*, 688 F.3d 863, 865–67 (7th Cir. 2012) (applying *Jimeno* and holding that general consent allowed officer to remove vehicle's interior molding with screwdriver and search hidden, unlocked

compartment because defendant was aware officer was look-
ing for drugs).[2]

C.  *Seizure of Garage Openers and Keys*

The officers also lawfully seized the garage door openers
and keys. Correa concedes that the officers "could look in the
bag to see if it contained anything illegal," but he argues that
he did not consent to seizure of those items. This argument
fails because Correa did not have to consent to the seizure.
After the officers found the drugs, they reasonably inferred
that the multiple garage door openers, sets of keys, and cell
phones could well be evidence of criminal activity.

Evidence is not limited to contraband, of course. See, e.g.,
*United States v. Johnson*, 383 F.3d 538, 545 (7th Cir. 2004) (per-
mitting warrantless search of car "if there is probable cause to
believe it contains contraband *or* evidence of a crime") (em-
phasis added). The police "may have probable cause to seize
an ordinarily innocuous object when the context of an inves-
tigation casts that item in a suspicious light." *Cellitti*, 387 F.3d
at 624 (collecting cases but holding that connection between
car keys and gun-focused investigation was too attenuated);
see also *United States v. Eschweiler*, 745 F.2d 435, 439 (7th Cir.
1984) (affirming seizure of safe deposit box key because agent
could infer suspect had safe deposit box that might contain
cocaine). While a single garage door opener "does not suggest

---

[2] These cases offer lessons for anyone who might be asked to consent
to a search of a vehicle or home. Such searches can be very intrusive and
even destructive. *Jimeno* "ensures that many motorists will wind up 'con-
senting' to a far broader search than they might have imagined." *Ohio v.
Robinette*, 519 U.S. 33, 48 n.5 (1996) (Stevens, J., dissenting), citing *Jimeno*,
500 U.S. 248, 254–55 (Marshall, J., dissenting).

any wrongdoing," these officers found not one but four garage door openers, together with three sets of keys and four cell phones. *Correa I*, 2013 WL 5663804, at \*2. And the officers found all of those items after finding suspected cocaine in the car and after watching Correa receive the bag that contained that cocaine from one of the unidentified men who had driven away from a handoff of at least $500,000 in cash eight days earlier. *Correa I*, 2013 WL 5663804, at \*1. Taken together, these investigative threads suggested enough of a connection between drug trafficking and the garage door openers, keys, and cell phones to justify their seizure as part of the search of the car.

D. *Use of Garage Door Openers, Fob, and Keys*

Using the garage door opener to find the condominium building was a search, but it was reasonable. The Fourth Amendment provides, in full:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The text does not expressly require warrants, but the prohibition against unreasonable searches and seizures has long been read "to require warrants in some circumstances as essential to the 'reasonableness' of particularly intrusive searches, such as those into dwellings." *United States v. Limares*, 269 F.3d 794, 799 (7th Cir. 2001), citing *Chimel v. California*, 395 U.S. 752 (1969); see also *United States v. Rivera*, 817

F.3d 339, 340 (7th Cir. 2016) ("Contrary to popular impression, the Fourth Amendment does not require a warrant to search or to arrest—ever; its only reference to warrants is a condemnation of general warrants."). Warrants are a proxy for reasonableness. See *Riley v. California*, 134 S. Ct. 2473, 2482 (2014); *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

Warrants, probable cause, reasonable suspicion, and other analytical labels are all ways to assess whether a search is reasonable. The Fourth Amendment essentially asks two questions: first, has there been a search or a seizure, and second, was it reasonable? See *Carpenter v. United States*, 138 S. Ct. 2206, 2215 n.2 (2018) (distinguishing "the threshold question whether a 'search' has occurred" from "the separate matter of whether the search was reasonable"); *Arizona v. Hicks*, 480 U.S. 321, 327 (1987) (analyzing search and reasonableness questions sequentially); see also William Baude & James Y. Stern, *The Positive Law Model of the Fourth Amendment*, 129 Harv. L. Rev. 1821, 1829 (2016). Those steps are not always neatly divided. See *id*.at 1871 & nn. 242–43 (noting that courts sometimes blend the question of reasonableness of law enforcement conduct with question of whether suspect had reasonable expectation of privacy). Following this approach, we conclude that using the garage door openers to locate the correct building was a search, but the search was reasonable.

1.  *Was There a Search?*

The Supreme Court uses two analytical approaches to decide whether a search has occurred. One is the property-based or trespass approach. E.g., *Florida v. Jardines*, 569 U.S. 1 (2013) (dog sniff on front porch of home); *United States v. Jones*, 565 U.S. 400 (2012) (installation of GPS tracking device on car). The other is based on expectations of privacy. E.g., *Riley*, 134

S. Ct. at 2488-91 (search incident to arrest of cell phone on arrestee's person). The two approaches work together, as was evident in *Byrd v. United States*, where the Court wrote that "'property concepts' are instructive in "determining the presence or absence of the privacy interests protected by that Amendment," 138 S. Ct. 1518, 1526 (2018), citing *Rakas v. Illinois*, 439 U.S. 128, 144 n.12 (1978), and that the reasonable expectation of privacy test "supplements, rather than displaces, 'the traditional property-based understanding of the Fourth Amendment.'" *Id.*, quoting *Jardines*, 569 U.S. at 11; see also *Jardines*, 569 U.S. at 12 (Kagan, J., concurring) (analyzing "on privacy as well as property grounds"); Baude & Stern, 129 Harv. L. Rev. at 1836 (property concept "operates as a sidecar to *Katz*"). Our opinions reflect that blended approach. See, e.g., *United States v. Sweeney*, 821 F.3d 893, 902–03 (7th Cir. 2016) (no search because there was no trespass of defendant-tenant's property interests and because he had no reasonable expectation of privacy in shared basement of apartment building); *United States v. Thompson*, 811 F.3d 944, 948 (7th Cir. 2016) (search occurs via either trespass or infringement of reasonable expectation of privacy).

Agent Asselborn's use of the garage door openers to find the condominium building was not a search of the garage at 1819 South Michigan Avenue, under either a trespass or privacy analysis. The agent did not trespass against these defendants' property interests. The trespass analysis can be fact-intensive, see, e.g., *Sweeney*, 821 F.3d at 899–900 (assessing whether plaintiff's lease conferred "exclusive property interest in any part" of shared common space), and can certainly be a more difficult question than it is here. We noted in *Sweeney* that even if the officer trespassed in a common area, the trespass would have been against the building's owner,

not against the defendant, who was an individual tenant. *Id.* at 900. We see no reason to conclude differently here. Even if there had been a trespass, we do not think the garage was protected from the agent's opening of the door. Three of the four factors for determining the scope of the curtilage, *id.* at 901 (collecting cases and listing factors as proximity of area to home, whether area is in an enclosure surrounding home, use of area, and whether steps have been taken to protect area from observation), cut in the government's favor. It was on a different floor than the target condominium. It was not "enclosed and intimate," *id.* at 902, to the condominium itself. If shared laundry facilities are not "intimately linked" to a home, as they were not in *Sweeney*, a shared parking facility is not. That leaves one factor that cuts slightly in the defendants' favor here—the fact that the garage was behind a garage door that only someone with an opener could open. Yet the agents did not even enter the garage.

The garage, though, is only half of the analysis: the openers are the other half. Agent Asselborn searched them by pushing the buttons, which interrogated the code generated by the opener with each push of the button. Absent a trespass, *Jones* suggests that we should focus on privacy. See 565 U.S. at 411 ("Situations involving merely the transmission of electronic signals without trespass would *remain* subject to *Katz* analysis.") (emphasis in original). *Katz* alone would have us focus on the reasonable expectation of privacy—just as in *United States v. Concepcion*, 942 F.2d 1170, 1172–73 (7th Cir. 1991), where we held that taking an arrestee's key and testing it in his apartment door was a search, though a reasonable one. Because the arrestee had no expectation of privacy in his apartment building's locked common area, we did not con-

duct the same analysis for the officers' use of one of the ar-restee's keys to open the door to the apartment building's locked common area. See *id.* at 1171–72.

The conclusion that this was a search of the openers fits with common sense. Agent Asselborn first took the openers at least three blocks away from the scene of Correa's arrest to test them on the garage of the building from which the unidentified men had emerged with the cash eight days earlier. When the openers did not work there, he tried them on "a bunch of townhouses with garages attached to them right in that area." And when that did not work, he "did a grid system." We believe that seeing this kind of approach—driving a car up and down streets and alleys testing multiple garage door openers, but backing up after one garage door opened, waiting for it to close, and then opening it again—would strike the layperson as an obvious search and "inspire most of us to—well, call the police." *Jardines*, 569 U.S. at 9.

### 2. *Was the Search Reasonable?*

The next question is whether the search was reasonable. The answer is yes. "There is no dispute that '[w]arrantless searches are presumptively unreasonable under the Fourth Amendment.'" *Thurman*, 889 F.3d at 365 (alteration in original), quoting *United States v. Strache*, 202 F.3d 980, 984 (7th Cir. 2000). "Therefore, '[i]n the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement.'" *Id.* (alteration in original), quoting *Riley*, 134 S. Ct. at 2482; see also *Vale v. Louisiana*, 399 U.S. 30, 34–35 (1970) (reversing denial of motion to suppress because search of premises after arrest and without warrant was not justified by any exception to warrant requirement); 2 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth

Amendment § 4.1(b) (5th ed.) (listing exceptions); 45 Geo. L.J. Ann. Rev. Crim. Proc. 49–176 (2016) (same).

By repeatedly pressing the openers' buttons, Agent Asselborn was, in essence, executing a set of searches in the wake of Correa's arrest. Agent Asselborn was taking chances. We conclude that the Fourth Amendment does not forbid this technique to identify the building or door associated with the opener, at least where the search discloses no further information. The logic of *Concepcion* suggests that Agent Asselborn could have shown the openers to landlords and asked them whether any of the openers matched the landlords' buildings. See 942 F.2d at 1173 (officers could have shown key to landlord to compare to key issued to tenant). Pressing buttons on openers that produce no response harms no one. Pressing the button of the opener that matched the building that turned out to house Correa and Melero's stash house was reasonable because these searches produced only an address, not any meaningful private information about the interior or contents of the garage. Correa had no reasonable expectation of privacy in that information. Officers routinely obtain that kind of information without a warrant as booking information and in searches incident to arrest.

Agent Asselborn used the openers to learn an address—the kind of information officers may lawfully obtain as part of the booking process. And in that context, even *Miranda* protections do not apply, at least where the address is collected for record-keeping purposes. *Pennsylvania v. Muniz*, 496 U.S. 582, 601–02 (1990) (opinion of Brennan, J.); see also *United States v. Ceballos*, 385 F.3d 1120, 1123 (7th Cir. 2004) (noting

that officers may question arrestee "to collect booking information incident to processing"), citing *United States v. Kane*, 726 F.2d 344, 349 (7th Cir. 1984).

At oral argument, counsel for Correa and Melero argued that garage door openers, unlike an arrestee's residential address provided at booking, do not necessarily indicate residence. But address books and wallets can provide officers with information beyond an arrestee's address. Courts have long held that officers may search wallets and address books found on arrestees without obtaining separate warrants for those searches, even if those searches are not conducted at the scene of an arrest. E.g., *United States v. Rodriguez*, 995 F.2d 776, 778 (7th Cir. 1993) (affirming denial of motion to suppress address book found on arrestee's person; searching and photocopying address book was permissible search incident to arrest even though search was conducted away from scene of arrest), citing *United States v. Molinaro*, 877 F.2d 1341, 1346–47 (7th Cir. 1989) (affirming denial of motion to suppress evidence seized from arrestee's wallet). *Riley* did not undo our approach to searches of wallets and address books incident to arrest. See *Riley*, 134 at 2493 (rejecting argument that "officers could search cell phone data if they could have obtained the same information from a pre-digital counterpart," but not expressly rejecting lower courts' approach to searches of those pre-digital counterparts); see also *id.* at 2496 n.* (Alito, J., concurring in part and concurring in judgment), citing *Rodriguez* and *Molinaro*.

Correa argues, though, that *Riley* resolves this case because its holding prohibiting warrantless searches of cell phones seized incident to arrest should be read more broadly to apply to searches of "non-contraband electronic items that

contain and/or can lead to privately held information in the home or about the home." *Riley* should not be read that broadly. Its holding was based on the Court's recognition that "Cell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person." 134 S. Ct. at 2489. Garage door openers do not implicate the same differences. *Riley* noted that cell phones "could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers." *Id*. Nevertheless, *Riley* helps to explain why Agent Asselborn's searches did not violate the Fourth Amendment.

As *Riley* reiterated, when "'privacy-related concerns are weighty enough' a 'search may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee.'" *Id.* at 2488, quoting *Maryland v. King,* 569 U.S. 435, 463 (2018); see also *Carpenter v. United States*, 138 S. Ct. 2206, 2220 (2018) (collection of cell-site location information "implicates privacy concerns far beyond those considered in *Smith* [pen register] and *Miller* [checks]"); but see *id.* at 2232 (Kennedy, J., dissenting) ("Still the Court errs, in my submission, when it concludes that cell-site records implicate greater privacy interests—and thus deserve greater Fourth Amendment protection—than financial records and telephone records."). Those concerns are not weighty enough here because the search of the garage door openers revealed only Correa's association with an address.

Like an officer searching an arrestee's wallet or address book, Agent Asselborn searched the garage door openers to generate investigative leads. *Riley* does not condemn that in-

vestigative step. In *Riley*, the Court warned that using an arrestee's cell phone to search files stored remotely "would be like finding a key in a suspect's pocket and arguing that it allowed law enforcement to unlock and search a house." *Id.* at 2491. Nothing comparable happened here. Agent Asselborn did not search or even enter the garage. We recognize that law enforcement creativity may call for judicial vigilance. See Baude & Stern, 129 Harv. L. Rev. at 1861 ("When police are intentionally pushing the limits of their power is precisely when we can ask them to check whether they are pushing too far."). But Agent Asselborn's searches of the garage door openers were good—or at least lucky—police work, not Fourth Amendment violations.

Officers are, of course, allowed and expected to investigate to build probable cause for an arrest. See *United States v. Prewitt*, 553 F.2d 1082, 1085 (7th Cir. 1977) (tracing origin of fraudulent money orders "in no way impinged on Prewitt's rights"). And if officers have probable cause to arrest someone, there is a good chance they also have probable cause to search his home for evidence. See *United States v. Kelly*, 772 F.3d 1072, 1080 (7th Cir. 2014) (officer obtained warrant for suspect's home on ground that drug dealers are likely to keep contraband in their residences); *United States v. Aljabari*, 626 F.3d 940, 946 (7th Cir. 2010) ("When probable cause exists to believe an individual has committed a crime involving physical evidence, and when there is no articulable, non-speculative reason to believe that evidence of that crime was not or could not have been hidden in that individual's home, a magistrate will generally be justified in finding probable cause to search that individual's home."), citing *United States v. Ressler*, 536 F.2d 208, 213 (7th Cir. 1976).

We do not address here what would happen if the agents had used the openers to open a private garage in which a resident had a reasonable expectation of privacy and then used what they saw to pursue further inquiries. (Imagine that the garage door goes up and officers see the stolen car they were told to look for. Cf. *Collins v. Virginia*, 138 S. Ct. 1663, 1671 (2018) (car exception did not permit officer to investigate motorcycle parked in curtilage).) We leave that scenario for a future case.

E.    *Accessing the Lobby, Testing the Mailbox Key, and Searching the Condominium*

Under the reasoning of *Concepcion*, using the key fob to enter the locked building lobby and testing the mailbox key were searches. 942 F.2d at 1172 ("inserting and turning the key is a 'search'"). The lobby was a common area in which Correa and Melero had no reasonable expectation of privacy. See *Sweeney*, 821 F.3d at 902, citing *Harney v. City of Chicago*, 702 F.3d 916, 925 (7th Cir. 2012). And Agent Asselborn did not trespass on their interests because Correa and Melero had no right to exclude anyone from the area. See *id.* at 899–900 ("to prove a claim of trespass, one must have possession of the property in question and the ability to exclude others from entrance onto or interference with that property"). But the officers learned something from using the fob and the mailbox key. They learned that Correa had access to the building and to a particular unit. That was enough for us to conclude that testing the key in the lock of the apartment was a search in *Concepcion*, 942 F.2d at 1172–73, and we see no reason to draw a different conclusion when the search is of a common-area door rather than an apartment door.

The search was reasonable and so did not violate the Fourth Amendment. For the reasons discussed regarding the search of the garage door opener, using the fob to access the lobby and testing the mailbox key without a warrant were reasonable searches. The officers needed to investigate to obtain more information—either to approach Correa and seek consent or to seek a warrant.

In *United States v. Bain*, the First Circuit criticized our "reasoning [in *Concepcion*] that the information gathered by the search could have been easily obtained otherwise." 874 F.3d 1, 18 (1st Cir. 2017). But like the officers in *Concepcion*, the officers in *Bain* used the arrestee's keys on both the front door of the multi-family building and apartment doors inside. *Id.* at 8. The First Circuit expressly limited its analysis to the use of the key in the apartment door and said nothing in that limitation about using the key on the front door of the building. See *id.* at 19 n.9 ("We do not consider whether the curtilage of unit D extended … to the entire common space of 131 Laurel Street, which might mean that trying the key on the door of both of the other apartments in the building were searches of unit D."). So the First Circuit's criticism of *Concepcion* did not address, at least directly, a search like the one we address here. Unlike the officers in *Concepcion* and *Bain*, these officers did not use the keys to test the lock of the apartment door itself, let alone to enter the residence. They did not need to because they obtained Correa's consent to search the condominium.

The district court found that Correa's consent was valid because he had apparent authority to give it and because it was voluntary. *Correa I*, 2013 WL 5663804, at *6–7. Neither finding is clearly erroneous.

Correa also had apparent authority to consent to the search. When the officers asked him for consent, they knew he had possessed the garage door opener, the lobby key fob, and the mailbox key. Melero argues that merely possessing keys should not be enough to indicate apparent authority because otherwise, giving keys to "dogwalkers, dry cleaners, maids, or delivery persons" would give apparent authority. That argument is correct but incomplete. The apparent authority analysis depends on context, not just the object possessed. See *United States v. King*, 627 F.3d 641, 648 (7th Cir. 2010) (officers' belief that restaurant employee had apparent authority was justified where employee had keys to restaurant and alarm deactivation code and opened restaurant, "a small establishment," alone); see also *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974) ("authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes") (citations omitted). Given the context here—a days-long investigation in which Correa accepted a package of cocaine in a parking lot and, by his own admission, was driving toward the building's intersection when he was pulled over immediately afterward, *Correa I*, 2013 WL 5663804, at *6—the officers could reasonably believe Correa had authority to consent.

We also agree with the district court that Correa's consent was voluntary. Determining whether consent was voluntary depends on the totality of the circumstances, and several factors may be relevant. See *Cellitti*, 387 F.3d at 622 (factors include: "(1) the age, intelligence, and education of the person who gave consent, (2) whether she was advised of her consti-

tutional rights, (3) how long she was detained before consenting, (4) whether she consented immediately or only after repeated requests by authorities, (5) whether physical coercion was used, and (6) whether she was in police custody at the time she gave her consent"), citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973), and *United States v. Raibley*, 243 F.3d 1069, 1075–76 (7th Cir. 2001). Although the district court did not expressly evaluate the relevant factors to assess voluntariness, we see no clear error in its finding. The officers asked Correa if they could "check 1819 South Michigan, Unit 702." Correa said "'Go ahead and search it.'"

On appeal, Correa argues that his consent was involuntary because he was handcuffed, the officer who gave him *Miranda* warnings was not the same agent who requested consent, the agents did not advise him that he could refuse, and he refused to sign a consent form. The first argument conflicts with Correa's testimony at the suppression hearing where he testified that he was *not* handcuffed. The other arguments do not indicate an involuntary consent. See *United States v. Valencia*, 913 F.2d 378, 381 (7th Cir. 1990) (affirming finding of voluntariness where officers made no threats, defendant remained calm, never refused consent, received *Miranda* warnings, was informed that he did not have to consent, and indicated that he understood rights). To the extent Correa's account differs from the officers, we find no basis to disturb the district court's credibility determination. See *Correa I*, 2013 WL 5663804, at *6.

Melero's challenge to his arrest also fails. After the agents found the drug evidence and documents relating to Melero in

Unit 702, the neighbor's identification of Melero gave them probable cause to arrest him.

   The judgments are

                                                    AFFIRMED.

RIPPLE, *Circuit Judge*, concurring. I join the judgment and the opinion of the court. This is a very difficult case and certainly presents a situation near the outer limits of what the Fourth Amendment tolerates. Of special concern to me is the officers' entry into the locked foyer of the building. Given our decisions in *United States v. Concepcion*, 942 F.2d 1170 (7th Cir. 1991), and in *United States v. Sweeney*, 821 F.3d 893 (7th Cir. 2016), the officers can rely on the good faith exception to the exclusionary rule. Mr. Correa has not carried, moreover, his burden of demonstrating that the analysis here reflects inadequately his cognizable property and privacy rights. Nonetheless, this case should prompt us to consider whether our present case law reflects adequately the new realities of property ownership and privacy in an urban setting such as the one here.

As set forth in *Concepcion* and, to a somewhat lesser extent in *Sweeney*, the general rule of the last several decades has been that common areas in multi-dwelling buildings are not within the protection of the Fourth Amendment. Both our case law and the case law of at least four of our sister circuits reflect this approach.[1] We need to be vigilant that our articulation and application of that default rule does not

---

[1] *United States v. Hawkins*, 139 F.3d 29, 32–33 (1st Cir. 1998) (apartment basement); *United States v. Nohara*, 3 F.3d 1239, 1241–42 (9th Cir. 1993) (apartment hallway); *United States v. Barrios-Moriera*, 872 F.2d 12, 14–15 (2d Cir. 1989) (apartment hallway), *abrogated on other grounds*, *Horton v. California*, 496 U.S. 128 (1990); *United States v. Eisler*, 567 F.2d 814, 816 (8th Cir. 1977) (apartment hallway); s*ee also United States v. Pyne*, 175 F. App'x 639, 640–41 (4th Cir. 2006) (concluding that an apartment parking garage with an unreliable security gate was a common area not within the scope of the Fourth Amendment's protection).

become so rigid and so automatic that we overlook situations where the realities are otherwise.

The Supreme Court's precedent does not require that we ignore the social and economic realities of contemporary urban America. In *United States v. Dunn*, 480 U.S. 294 (1987), the Supreme Court identified four factors that we should consider when determining the scope of curtilage. They are "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Id.* at 301. As mentioned previously, federal district courts applying these factors generally have found common areas unprotected by the Fourth Amendment because they are not within the exclusive control of the apartment owners or are used routinely by others.[2] State courts have followed the same path.[3] There

---

[2] *See*, *e.g.*, *Seay v. United States*, Nos. 15-3367 & 14-0614, 2018 WL 1583555, at *5 (D. Md. Apr. 2, 2018) (applying *Dunn* to determine that a common hallway in an apartment is not curtilage); *United States v. Bain*, 155 F. Supp. 3d 107, 116–17 (D. Mass. 2015) (applying *Dunn* to determine a landing outside of a tenant's door in an apartment hallway is not curtilage), *aff'd*, 874 F.3d 1 (1st Cir. 2017).

[3] *See*, *e.g.*, *State v. Luhm*, 880 N.W.2d 606, 617–18 (Minn. Ct. App. 2016) (applying *Dunn* and finding no reasonable expectation of privacy in the common area of a secured, multi-unit condominium building); *State v. Nguyen*, 841 N.W.2d 676, 680–82 (N.D. 2013) (deciding "[t]hat the law enforcement officers were technical trespassers in the common hallways is of no consequence because Nguyen had no reasonable expectation that the common hallways of the apartment building would be free from any intrusion" where the hallways were available to use of tenants, guests, and others having legitimate reasons to be on the property, and no ten-

(continued … )

always has been, however, a cautionary thread in our Fourth Amendment case law against rigid application of this general rule. The Supreme Court has emphasized that *Dunn*'s factor-based analysis is not a "finely tuned formula that, when mechanically applied, yields a 'correct' answer to all extent-of-curtilage questions." *Id.* This caution suggests that our inquiry should be a fact-intensive consideration of "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.*

From time to time, we have expressed a mistrust of adopting ironclad rules about common spaces. In *Reardon v. Wroan*, 811 F.2d 1025, 1027 n.2 (7th Cir. 1987), we noted that the hallways of a fraternity house were protected. We reasoned that a fraternity is "an exclusive living arrangement with the goal of maximizing the privacy of its affairs" and that fraternity members are, practically speaking, "roommates in the same house" rather than "co-tenants sharing certain common areas." Indeed, in *United States v. Whitaker*, 820 F.3d 849, 854 (7th Cir. 2016), we acknowledged explicitly that there is a "middle ground between traditional apartment buildings and single-family houses," and recognized that "a strict apartment versus single-family home distinction is troubling because it would apportion Fourth Amendment protections on grounds that correlate with income, race, and ethnicity." We explicitly stressed in *United*

---

( … continued)

ant could bar entry to such visitors); *State v. Dumstrey*, 873 N.W.2d 502, 512–15 (Wis. 2016) (determining that an apartment parking garage is not curtilage under the *Dunn* factors).

*States v. Villegas*, 495 F.3d 761, 768–69 (7th Cir. 2007), the fact-specific nature of this inquiry.[4]

It is more difficult today to determine whether, on any given set of facts, individuals may claim Fourth Amendment protection beyond the boundaries of an individual living unit. Concerned about personal security and driven by economic necessity, individuals now engage in a wide variety of property arrangements to ensure that they have increased access to, and control over, the area outside the door to their individual condominiums or cooperative apartments. These contemporary changes necessitate constant vigilance that we take the time to appreciate fully the specific facts of such arrangements. Today, young adults live in quasi-communal arrangements to cope with the high cost of living in major cities; more affluent individuals live in condominium arrangements under increasingly strict agreed-upon rules; residents prescreen newcomers and occasionally the residential group is preformed; and senior citizens live in retirement communities where meals are taken in common and congre-

---

[4] Notably, in *People v. Burns*, 50 N.E.3d 610 (Ill. 2016), the Illinois Supreme Court determined the third-floor landing of an apartment building was protected by the Fourth Amendment. The court suggested that the property-based rationale in *Florida v. Jardines*, 569 U.S. 1 (2013), is applicable to apartments and condominiums because the secured building's common areas were clearly not open to the general public. *Id.* at 620. The court also applied the *Dunn* factors and concluded that the landing was within the curtilage of the apartment. *Id.* at 620–22. Taking the factors in turn, it determined that the landing was in close proximity to the apartment; was located in a locked structure intended to exclude the general public outside of the tenant, his neighbor, and their invitees; and was not observable to people passing by.

gate living is expected as a condition for membership. In these situations, individuals have definite expectations, grounded in property rights or custom, about who is welcome in various parts of the establishment. *Cf. Moore v. City of East Cleveland*, 431 U.S. 494, 504 (1977) (plurality opinion of Powell, J.) ("Ours is by no means a tradition limited to respect for the bonds uniting the members of the nuclear family."). Fourth Amendment protections are not limited only to the most common living arrangements of the day. Those who assert the Fourth Amendment's protections must have a right to demonstrate that their living arrangement is grounded in assertions of property rights[5] or custom recognized by the community. *Cf. Kras v. United States*, 409 U.S. 434, 460 (1973) (Marshall, J., dissenting) ("[i]t is disgraceful for an interpretation of the Constitution to be premised upon unfounded assumptions about how people live."). As the Supreme Court has demonstrated recently in *United States v. Jones*, 565 U.S. 400 (2012), we must be sensitive to changes in modern life that impact Fourth Amendment values. Formalistic bright-line rules of the past do not always provide useful tools of analysis.

The Supreme Court has said that case-by-case adjudication of search and seizure cases will permit the courts "to unify precedent and will come closer to providing law enforcement officers with a defined set of rules which, in most instances, makes it possible to reach a correct determination

---

[5] The Supreme Court recently has emphasized that both property concepts and privacy expectations can determine the scope of the Fourth Amendment. *See, e.g., Florida v. Jardines*, 569 U.S. 1 (2013); *United States v. Jones*, 565 U.S. 400 (2012).

beforehand as to whether an invasion of privacy is justified in the interest of law enforcement." *Ornelas v. United States*, 517 U.S. 690, 697–98 (1996) (internal quotation marks omitted). Premature reduction of precedent to rigid rules, however, can blind us to the values that we all agree are at the heart of the Fourth Amendment. Oversimplification of a nuanced and changing area is a superficial, and artificial, solution.

Because Mr. Correa has failed to carry his burden of establishing that he had a cognizable property interest or an expectation of privacy in the common lobby, the garage door or the remote device, his Fourth Amendment claim must fail. Moreover, as I noted at the outset, the officers can justify their opening of the locked lobby door on circuit precedent. Accordingly, with respect to those actions, the good faith exception to the warrant requirement bars the application of the exclusionary rule.

For these reasons, I join the judgment and the opinion of the court.