In the

# United States Court of Appeals
## for the Seventh Circuit

No. 22-1896

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROBERT J. MILLER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 20-CR-10031-001 — **James E. Shadid**, *Judge.*

ARGUED DECEMBER 14, 2022 — DECIDED MAY 23, 2023

Before SYKES, *Chief Judge*, and SCUDDER and LEE, *Circuit Judges*.

SYKES, *Chief Judge*. Robert Miller pleaded guilty to possessing a firearm as a felon but reserved the right to appeal the denial of his motion to suppress the firearm and other evidence found in his car. He argues that the police conducted an unlawful search by using his key fob—the small device that controls the remote keyless entry system—to identify his car. We do not need to decide whether activating

the key fob was a search within the meaning of the Fourth Amendment. Even if it was, the district court correctly held that the evidence was admissible under the independent-source doctrine. We therefore affirm the judgment.

## I. Background

According to the parties' stipulation of facts for the motion to suppress, officers from the Peoria Police Department responded to the scene of gunfire in the 200 block of East Arcadia Street and found Miller lying on the sidewalk, bleeding from an apparent gunshot wound to his face. He was conscious, however, and able to speak with the officers. As Officer Danny Marx began to render aid, he saw that Miller was holding his cellphone in his left hand and a key fob to a vehicle in his right hand. Officer Marx removed the key fob from Miller's hand, dropped it on the ground, and began assessing Miller's physical condition.

Meanwhile, other officers investigated the surrounding area. A white Mercury sedan was parked about 15 to 20 feet from Miller, the only car on that side of the street for about 100 feet in either direction. The car had multiple bullet holes in the rear driver's side door, so a sergeant instructed officers to check if there was anyone in the car. An officer looked through the windows and announced that there was no one inside. Another officer shined his flashlight through the windshield, saw what he thought was blood on the front passenger seat, and told the other officers that it looked as though Miller had gotten out on the passenger side.

While inspecting the bullet holes in the car door, one of the officers asked if Miller owned the car. Officer Marx, who was still speaking with Miller, picked up the key fob that he

had removed from Miller's hand. He clicked a button on the fob, and the Mercury's horn honked several times. Officer Marx said, "Yeah, that's his car."

Emergency medical personnel then arrived. An officer asked Miller if all the blood in the car was his; Miller answered that it was. Several minutes later, an officer shined his flashlight through the driver's side window of the sedan and told the others that he could see the sights and barrel of a gun sticking out from under a hat on the front passenger seat. The officers did not enter the passenger compartment of the car at that time. Instead, the car was towed to the police station.

Miller was taken to the hospital where he was treated for gunshot wounds to his face and upper shoulder. A detective interviewed him at the hospital. Miller said that he was using his girlfriend's car, a white Mercury SUV, and that he was shot as he was unlocking the car. A check of a law-enforcement database, however, showed that the impounded car was registered to Miller.

The police sought a warrant to search the car. The warrant application listed the vehicle identification number, explained that the car belonged to Miller, and described his statement about the shooting. The application also described the scene, including the bullet holes in the car and numerous spent shell casings found in the street. The affidavit explained that although the vehicle was locked, an officer had looked through a window and noticed blood on the front passenger seat and the rear of a black pistol protruding from under a baseball hat. The application requested a warrant to search the car for evidence, including firearms, bullets, blood, and DNA. There was no mention of a key fob.

A state-court judge approved the warrant, and police searched Miller's car and recovered the gun that was visible through the window. DNA from blood on the gun matched Miller's. He was indicted for possessing a firearm as a felon, 18 U.S.C. § 922(g).

Miller moved to suppress the evidence seized from the car, arguing that it was the fruit of an unlawful search—namely, the officer's activation of the key fob without a warrant or an applicable exception to the warrant requirement. The motion was cursory but appeared to argue that (1) clicking the key fob qualified as a search within the meaning of the Fourth Amendment; and (2) the search violated Miller's rights because Officer Marx activated the key fob before the officers had any reason to suspect that he had committed a crime, and they saw the gun in the car only after the officer used the fob to connect him to the car.

The district judge denied the suppression motion, explaining that pressing the button on Miller's key fob was not an unlawful search because the fob was used only to identify the car, not to gain entry. He further reasoned that Miller had no reasonable expectation of privacy in the identity of his car because the officers had a legitimate interest in investigating the signs of criminal activity at the scene. Alternatively, the judge held that even if activating the key fob was an unlawful search, suppression was unnecessary by operation of the independent-source doctrine. Even before Officer Marx used the fob, the police had enough evidence to support the warrant to search the car: they saw Miller lying nearby with an obvious gunshot wound, the car was riddled with bullet holes, and there was blood on the front passenger seat.

Miller later entered a conditional guilty plea, *see* FED. R. CRIM. P. 11(a)(2), reserving his right to appeal the judge's ruling on the suppression motion. He was sentenced to 69 months in prison for this offense.[1]

## II. Discussion

The sole issue on appeal is Miller's challenge to the denial of his suppression motion. We review the judge's factual findings for clear error and legal conclusions de novo. *United States v. Correa*, 908 F.3d 208, 214 (7th Cir. 2018).

Inquiries under the Fourth Amendment generally proceed in two steps. The first asks whether a search occurred. *Id.* at 217. The Supreme Court has developed two analytical approaches to this question, one based on an assessment of reasonable expectations of privacy and the other centered on a property-based or trespass inquiry. *Id.* If indeed a search occurred, we evaluate its constitutionality under the Fourth Amendment's reasonableness requirement. *Id.* at 218. The police normally need a warrant to ensure compliance with the constitutional standard; a warrantless search is reasonable "only if it falls within a specific exception to the warrant requirement." *Riley v. California*, 573 U.S. 373, 382 (2014); *Correa*, 908 F.3d at 218–19.

We have not yet had occasion to consider whether an officer's use of a key fob to identify a car is a search, though our cases have addressed similar issues. In *Correa* we addressed the actions of a DEA agent who drove around a Chicago neighborhood pressing the buttons on a confiscated

---

[1] At the same time, the judge also imposed a prison term of 36 months on the revocation of Miller's supervised release, with 12 months of the revocation sentence to run consecutively to his sentence for this offense.

garage-door opener to determine which door it opened. 908 F.3d at 212–13. We classified that action as a search—not of the garage, but of the opener. *Id.* at 218. We reasoned that "with each push of the button," the officer collected the stored coded information connecting the opener to a particular garage door. *Id.*

Similarly, in *United States v. Concepcion*, a DEA agent confiscated keys from an arrested suspect and tested one of them in the locked door of what the agent thought was the suspect's apartment; when the door opened, the agent sought and obtained the suspect's consent to search. 942 F.2d 1170, 1171 (7th Cir. 1991). We held that testing the key in the lock was a search because keyholes contain "information about who has access to the space beyond." *Id.* at 1172; *see also United States v. Thompson*, 842 F.3d 1002, 1008 (7th Cir. 2016) (applying *Concepcion*).

Miller argues that Officer Marx conducted a search within the meaning of the Fourth Amendment because clicking the button on the key fob disclosed private information connecting him to the Mercury sedan. He reads *Correa* and *Concepcion* for the proposition that using keys and remote door openers to gain information constitutes a search.

The government responds that Officer Marx's use of the key fob was not a search because Miller did not have a reasonable expectation of privacy in the information at issue here regarding his connection to the shot-up Mercury. For support the government relies on *United States v. Cowan*, 674 F.3d 947, 955–56 (8th Cir. 2012), a factually similar case from the Eighth Circuit. There the police obtained a warrant to search an apartment where they had just conducted a controlled drug buy. *Id.* at 951. Before the search, they per-

formed a protective frisk of the occupants, including the defendant, and recovered a vehicle key fob from his pocket. *Id.* After finding crack cocaine in the apartment, a detective took the defendant outside and pushed the alarm button on the key fob, which set off the alarm on a car parked in front of the building. *Id.* A canine drug sniff followed, and the dog alerted for the presence of drugs in the car. *Id.*

The district court suppressed the drugs found in the car as the fruit of an unlawful search. *Id.* at 952. On the government's interlocutory appeal, the Eighth Circuit reversed. *Id.* at 958–59. The court held that the defendant "did not have a reasonable expectation of privacy in the identity of his car" because the officers could have obtained the same information connecting him to the car "by conducting a background check on the car's license plates or vehicle identification number or [by] placing the car under surveillance." *Id.* at 955. The court also reasoned that the officer's use of the key fob did not involve a trespass. *Id.* at 956.

The court's decision in *Cowen* suggests it rests on a rationale that the officer's use of the car's key fob was not a search, but it might be better understood to hold that the use of the key fob was not unreasonable under the circumstances. If the former, then *Cowen* is in some analytical tension with our decisions in *Correa* and *Concepcion*. Recognizing this point, the government argues in the alternative that if Officer Marx's activation of the key fob is properly classified as a search, then it was not an unreasonable one because the search revealed only limited information cloaked in minimal (if any) expectation of privacy.

This backup argument rests on our ultimate holdings in *Correa* and *Concepcion*. Though we concluded in both cases

that searches had occurred, we upheld the searches as reasonable because the agents' use of the garage opener (*Correa*) and apartment key (*Concepcion*) revealed only limited nonprivate information connecting the suspects to those places—information that the agents easily could have obtained from readily available sources. *See Correa*, 908 F.3d at 218–21; *Concepcion*, 942 F.2d at 1172–73.

Though this issue will no doubt arise again, resolving this appeal doesn't require us to decide whether activating a car's key fob is a search, and if so, whether such a search survives reasonableness review. As an alternative ground for denying the suppression motion, the judge credited the government's argument that the police recovered the gun and other evidence in the car through independent, lawful means—namely, the warrant.[2] The independent-source doctrine was clearly an alternative basis for the ruling below, but Miller did not address it in his opening brief on appeal. He discussed only the "inevitable discovery" rule. *See United States v. Marrocco*, 578 F.3d 627, 637 (7th Cir. 2009).

The government notes Miller's omission and argues that we should affirm for that reason alone. *See United States v. Boliaux*, 915 F.3d 493, 496 (7th Cir. 2019) ("If you lose in the district court on multiple grounds, you must contest all on appeal; prevailing on one won't suffice."). In his reply Miller contends that the two doctrines are so related that he ade-

---

[2] The government also invokes the automobile exception, *see Arizona v. Gant*, 556 U.S. 332, 347 (2009), and the exigent-circumstances doctrine, *see Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). We have no need to address these arguments.

quately preserved appellate review of the judge's alternative ruling.

Setting the procedural point aside, Miller cannot overcome the force of the independent-source doctrine. An exception to the exclusionary rule, the independent-source doctrine permits the admission of the fruit of an unlawful search if the government obtained the evidence "via an independent legal source, like a warrant." *United States v. Huskisson*, 926 F.3d 369, 374 (7th Cir. 2019). Here the officers recovered the gun in the execution of a valid warrant to search the car. Under the independent-source doctrine, we ask two questions: (1) did the evidence obtained from the officer's use of the key fob affect the judge's decision to issue a warrant; and (2) did that evidence affect the officers' decision to apply for a warrant? *Id.*

The key-fob evidence connecting Miller to the car in no way affected the judge who signed the warrant: the warrant application did not mention the key fob at all. *See United States v. Gonzalez*, 555 F.3d 579, 582 (7th Cir. 2009). The application relied on other facts that easily supplied probable cause to believe that the Mercury contained evidence of a crime: the bullet holes; the blood in and around the car; Miller lying nearby with a gunshot wound; and the gun on the passenger seat, visible through the window but partially obscured by a hat. *See Huskisson*, 926 F.3d at 375–76. None of this evidence depended on evidence obtained by using the key fob.

For essentially the same reasons, the officers' decision to apply for the warrant was not "prompted by information gained from" the click of the key fob. *See Gonzalez*, 555 F.3d at 581. Miller insists that the police sought the warrant

because they knew that the car (and likely the gun) belonged to him and that they knew this only because Officer Marx activated the key fob.

This argument doesn't hold up under the weight of the stipulated facts. The officers arrived at the scene of a suspected shooting, found Miller bleeding from an apparent gunshot wound, and saw the Mercury nearby with bullet holes and blood in and around it. All this occurred *before* Officer Marx pressed the button on Miller's key fob. So before the police connected Miller to the Mercury, they had already identified the car as key evidence in a shooting, giving them ample probable cause for a warrant. On these facts, it's simply implausible to argue that the officers sought the warrant because of what they learned from the click of the key fob. The car would have been searched regardless of the identity of its owner. *See Huskisson*, 926 F.3d at 376–77. And as the government also suggests, it was completely reasonable to assume Miller's connection to the vehicle even before Officer Marx confirmed the point by activating the key fob. The suppression motion was properly denied.

AFFIRMED